[Cite as *Thomas v. Othman*, 2017-Ohio-8449.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| RICHARD THOMAS, | : | APPEAL NO. C-160827 |
| | | TRIAL NO.  A-1601001 |
| and | : | |
| GAIL THOMAS, | : | *O P I N I O N.* |
| Plaintiffs-Appellants, | : | |
| vs. | : | |
| AKRAM OTHMAN, | : | |
| and | : | |
| MARK WOEHLER, | : | |
| Defendants-Appellees. | : | |

Civil Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed from is:  Affirmed

Date of Judgment Entry on Appeal:  November 8, 2017

*William Flax,* for Plaintiffs-Appellants,

*James R. Hartke*, for Defendant-Appellee Akram Othman,

*George M. Parker*, for Defendant-Appellee Mark Woehler.

**CUNNINGHAM, Presiding Judge.**

{¶1} Plaintiffs-appellants Richard and Gail Thomas appeal from the judgment of the Hamilton County Court of Common Pleas granting the motion of defendants-appellees Akram Othman and Mark Woehler to dismiss the amended complaint for failure to state a claim upon which relief could be granted, pursuant to Civ.R. 12(B)(6). For the reasons that follow, we affirm.

## I. Background Facts and Procedure

{¶2} This appeal arises from the Thomases' efforts to recover from Othman and Woehler a portion of the retirement funds the Thomases lost after investing them in a Ponzi scheme operated by Glen Galemmo. According to the allegations in the amended complaint, Galemmo was convicted of securities fraud in the case *United States v. Galemmo*, Case No. 1:13-CR-00141, for operating a "complex," multi-year "Ponzi scheme." The Thomases, Othman, and Woehler were all investors in the scheme, and are all members of the plaintiff class of "Net Losers" investors—investors who lost more than their principal investment—in several civil class-action lawsuits which were referenced in the Thomases' complaint.

{¶3} Like the other "Net Losers," the Thomases, Othman, and Woehler have recovered and may continue to recover some of their losses from money forfeited in the criminal case against Galemmo, and from money recovered from "Net Winner" investors sued in the civil class actions in a court approved allocation plan. The individual recoveries in the criminal and civil actions are "pro rata," defined in the amended complaint as meaning that "each 'loser' recovers the same percentage of the total net recovery as his net loss bears to the total net losses of 'Net Losers.' "

{¶4} Although all are net loser investors, Othman and Woehler were earlier investors who recouped a part of their principal investment during the scheme. The

Thomases were later investors who had "no opportunity to recoup any part" of their principal investment, comprising about $700,000 in retirement funds, some of which, they allege, was paid to Othman and Woehler.

{¶5} Although frustrated that the distribution in the class-action cases did not draw the equitable distinctions among the losing investors that the Thomases wanted, nonetheless the Thomases took their pro rata distributions in those cases and filed this individual action against Othman and Woehler to recover "specific funds" they identified as their property.

{¶6} Specifically, the Thomases alleged that they could "trace" the retirement funds that they were fraudulently induced to invest with Galemmo, and that were deposited into a bank account associated with a Galemmo entity, to "specific payments" made to Othman and Woehler from a bank account associated with another Galemmo entity during the execution of the Ponzi scheme. The Thomases asserted they could trace their retirement fund deposits to payments to Othman and Woehler even though those retirement fund deposits had been commingled with other deposits in the Galemmo entity accounts. The Thomases sought to recover from Othman and Woehler a percentage of the challenged payments on the grounds that the transfers by Galemmo were "fraudulent," as contemplated by Ohio's Fraudulent Transfer Act, and that they had a superior equitable "position" with respect to "their own misallocated [retirement] funds" when compared with Othman and Woehler, who were "unjustly enriched."

{¶7} With regard to Woehler, the Thomases alleged that his claim to the challenged payment was "compromised by [his] longstanding interaction with Galemmo and the Galemmo entities," and he "is believed to have been introduced to the Galemmo entities by Steve Schuholz, a close and long standing associate" of

3

Galemmo and a defendant in one of the class-action lawsuits brought by the class of net losers.

{¶8} With respect to Othman, they alleged that Galemmo issued him a check from one of Galemmo's entities on June 6, 2013, just two days after the IRS had raided Galemmo's main office and seized voluminous documents. Further, they claimed that this large payment made to Othman was allegedly "requested" by Othman's "friend" David Dahoud, an "associate" of Galemmo's "who enjoyed the privilege and use of a desk in Glen Galemmo's office, received commissions for introducing persons who would invest in Galemmo entities," was "fully aware" of the IRS raid when he obtained the check for Othman, and is a defendant in one of the class-action lawsuits. Finally, they alleged that Galemmo's "deliberate act of favoritism" to Othman was also demonstrated by Othman's friendship with Schuholz and by Galemmo's reference to Othman by his first name in a 2014 deposition.

{¶9} In relief, as relevant to this appeal, the Thomases requested that the court impose a "constructive trust" on the assets obtained or retained by Othman and Woehler as a result of the "fraudulent transfers."[1]

{¶10} Othman and Woehler moved to dismiss. In the alternative, they sought to transfer and consolidate the action with one of the pending class-action cases in which all parties were members of the plaintiff class, and where distributions had already been made based on a pro rata basis pursuant to an order approving the plan of allocation.

{¶11} In their motion, Othman and Woehler argued that dismissal was appropriate because the allegations did not establish any cause of action against a

---

[1] In their complaint, the Thomases suggested that the evidence may later disclose facts to support a claim for fraud against Othman and Woehler. On appeal, the Thomases do not challenge the trial court's dismissal of this "cause of action."

4

"Net Loser," and because the claims, which they characterized as merely a disagreement with the prorated recoveries in the class-action cases stemming from the Galemmo Ponzi scheme, were part of an attempt to "circumvent th[e] settlement" in the civil cases.

{¶12} In response, the Thomases argued that their individual lawsuit sought "a fair weighing of the relative equities between them[selves] and Woehler and Othman" with respect to "specific transactions on specific dates." While acknowledging that they tried to raise these issues in the class-action cases, they took the position that the class actions involved only a dispute about competing equitable claims to funds already distributed in the settlement.

{¶13} In support of their claims against Othman and Woehler in the specific funds, which they claimed they could trace and in which they claimed superior rights in equity, the Thomases cited *United States v. Durham*, 86 F.3d 70 (5th Cir.1996). *Durham* involved the government's distribution of assets seized from the perpetrator of a fraudulent brokerage scheme. The district court ordered that the recovered assets be distributed to the fraud victims on a pro rata basis, even though a victim successfully traced its assets and sought the imposition of a constructive trust on the traced funds. The victim appealed, and the circuit court affirmed, holding that the pro rata distribution of seized assets was within the district court's discretion because the court was able to identify equitable considerations sufficient to justify disallowing the tracing of assets that the United States Supreme Court discussed in *Cunningham v. Brown*, 265 U.S. 1, 44 S.Ct. 424, 68 L.Ed. 873 (1924). *Durham* at 73.

{¶14} *Cunningham* involved the bankruptcy of the infamous Charles Ponzi and included a discussion of the restitutional remedy of a constructive trust in the context of a Ponzi scheme. Ponzi operated a scheme by which he would receive

money from new "investors" from which he would pay earlier "investors." He promised to pay in 90 days $150 for every $100 loaned, claiming that he had discovered a great investment opportunity buying international postal coupons. But Ponzi did not make any investments, and "all the money he had at any time was solely the result of loans by his dupes." *Cunningham* at 8.

{¶15} After the public learned that Ponzi was insolvent, but before the filing of the petition in bankruptcy, a few of his more recent victims demanded the return of their money, and they were paid out of one of Ponzi's bank accounts. The trustee in bankruptcy sought the return of the money, alleging that the transfers constituted unlawful preferences under bankruptcy law. The lower courts agreed with the trustee. The Supreme Court disagreed with the analysis of the lower courts. Of importance here, the Court recognized that assets acquired by fraud are subject to a constructive trust for the benefit of the defrauded party, but only where that property can be "traced." The Court rejected the use of presumptive tracing, which applies between the wrongdoer and the claimant, "when the fund with which the wrongdoer is dealing is wholly made up of the fruits of the frauds perpetrated against a myriad of victims." *Id.* at 13. The effect of successful tracing, the Court explained, is that you are able to get your "own money," and "not money in the estate of the bankrupt," which would violate the rule against preference in bankruptcy. *Id.* at 11. Because the investors were unable to trace the funds, they merely had a personal claim against the wrongdoer. *Id.* at 12.

{¶16} After a hearing on the matter, the trial court rejected the Thomases' arguments and dismissed the action under Civ.R. 12(B)(6). The trial court explained the basis of its judgment in the entry of dismissal:

6

Construing all factual allegations in the amended complaint as true, plaintiff[s] still ha[ve] not stated a claim against the defendants. Plaintiffs' claims are still in the nature of preference claims, which, if valid, can only be brought in the pending class action or in a separate action on behalf of all net losers. If [the] plaintiff[s] recover[] in this case, their recovery would be disproportionate to the other net losers of the class. Plaintiffs' amended complaint alleges no wrongdoing or knowledge on the part of the defendants.

{¶17} In two related assignments of error, the Thomases generally argue that the trial court erred by granting the motion to dismiss, reasoning that the amended complaint, when construed most strongly in their favor, stated a cause of action against Othman and Woehler upon which relief could be granted based on a tracing theory. And more specifically, they contend that the trial court misapplied the Civ.R. 12(B)(6) standard by focusing on their failure to seek a recovery on behalf of the other Net Losers.

## II. Analysis

{¶18} A motion to dismiss for failure to state a claim upon which relief can be granted is a procedural mechanism that tests the sufficiency of a civil complaint. *See, e.g., State ex rel. Hanson v. Guernsey Cty. Bd. of Commrs.*, 65 Ohio St.3d 545, 548, 605 N.E.2d 378 (1992); *O'Brien v. Univ. Community Tenants Union, Inc.*, 42 Ohio St.2d 242, 327 N.E.2d 753 (1975), syllabus. Thus, when deciding such a motion, the court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the nonmoving party. *See Mitchell v. Lawson Milk Co.*, 40 Ohio St.3d 190, 192, 532 N.E.2d 753 (1988). In general, when making a Civ.R. 12(B)(6) determination, the court is confined to the allegations of

7

the complaint. *See State ex rel. Hanson* at 548; *State ex rel. Neff v. Corrigan*, 75 Ohio St.3d 12, 16, 661 N.E.2d 170 (1996).

{¶19} A complaint should not be dismissed for failure to state an actionable claim unless it appears beyond doubt from the complaint that the plaintiff can prove no set of facts entitling him to recovery. *See Kesselring Ford, Inc. v. Cann*, 68 Ohio App.2d 131, 132-133, 427 N.E.2d 785 (1st Dist.1980). We review de novo the trial court's ruling to dismiss a complaint under Civ.R. 12(B)(6). *Inwood Village, Ltd. v. Cincinnati*, 1st Dist. Hamilton No. C-110117, 2011-Ohio-6632, ¶ 8.

{¶20} We begin by addressing the Thomases' argument directed at the trial court's concern that the fraudulent-transfer and unjust-enrichment claims could not go forward because the Thomases were not seeking a recovery for other Net Losers. The Thomases contend that the trial court's concern was misplaced because case law supports "the possibility of an equitable claim, as between the adverse rights of different victims of a Ponzi scheme, in traceable assets." Based on the particular facts alleged in this case and the applicable case law, we determine that the trial court's concern was not misplaced.

{¶21} This case involves the restitutionary rights and remedies of investor victims of a Ponzi scheme. In general, a Ponzi scheme is a type of investment fraud involving the payment of returns to existing investors with funds collected from new investors. *See* www.sec.gov/fast-answers/answersponzihtm.html (accessed Oct. 19, 2017). The organizers of the scheme solicit new investors into the fraud by promising investment opportunities that generate high returns and little or no risk. *Id.* Typically, the organizers "focus on attracting new money to make promised payments to earlier-stage investors to create the false appearance that investors are profiting from a legitimate business." *Id.* The scheme collapses when the flow of

money from new investors dries up or too many existing investors seek to cash out. *Id.* As the court in *Cunningham* recognized, Ponzi scheme victims may have claims in bankruptcy for fraud and seek rescission and restitution in identifiable, traceable property that is subject to a constructive trust in favor of the claimant.

{¶22} Here, the Thomases are attempting to enforce their restitutionary rights against Galemmo by means of a restitutionary remedy in the form of a constructive trust on the money they "invested" with Galemmo and Galemmo allegedly transferred to Othman and Woehler through the entities he controlled. The Thomases selected this approach because they seek a determination that the property is theirs alone, to avoid competition from Galemmo's general creditors, including the defendants and the other net loser victims of Galemmo's scheme. In other words, they are seeking priority over the other creditors of Galemmo.

{¶23} With respect to their claims, the Thomases allege they can trace the investment funds they gave to Galemmo into the hands of Othman and Woehler. Moreover, they claim that Galemmo fraudulently transferred their property to Othman and Woehler, his actual intent established by the fact that he operated a Ponzi scheme, and that to avoid the unjust enrichment of Othman and Woehler, the court should enforce a constructive trust over their property. Because their money has been commingled with that of Galemmo's creditors, they are only seeking a percentage of their money, which we note is consistent with the rule set forth in Restatement of the Law 3d, Restitution and Unjust Enrichment, Section 59(4).[2]

---

[2] This rule provides that "If a fund contains the property of multiple restitution claimants (such as the victims of successive fraud by the recipient)[,] [e]ach claimant's interest in the fund and any product thereof is determined by the proportion that such claimant's contributions bear to the balance of the fund upon each contribution and withdrawal, but only if the accounting necessary to this calculation can be established without using the presumptions or marshalling rules of section 59(2). If the evidence does not permit the court to distinguish the interests of multiple restitution claimants by reference to actual transactions, such claimants recover ratably from the fund and any product thereof in proportion to their respective losses."

{¶24} The Thomases maintain that they stated a claim under the common law of unjust enrichment and Ohio's Fraudulent Transfer Act ("OFTA"). In general, the OFTA codifies the common law of unjust enrichment with respect to fraudulent transfers. Where a creditor establishes a debtor made a transfer with an actual intent to delay, hinder, or defraud any creditor, *see* R.C. 1336.04(A), the recipient of the transfer can raise the affirmative defense of good faith and reasonably equivalent value. R.C. 1336.08(A).

{¶25} Courts have routinely applied Fraudulent Transfer Acts similar to Ohio's, which is based upon the Uniform Fraudulent Transfer Act ("UFTA"), to allow receivers or trustees in bankruptcy to avoid transfers and recover monies lost by Ponzi-scheme investors. *Donell v. Kowell*, 533 F.3d 762, 767 (9th Cir.2008). Less frequently, class representatives have used the UFTA to recover monies for the class. *See Carroll v. Stettler*, No. 10-2262, 2011 WL 5008361, *8 (E.D.Pa. Oct. 19, 2011) (suggesting that it may be "the first class action brought under a uniform fraudulent transfer statute to recover the proceeds of a Ponzi scheme" on behalf of net losing victims of the scheme against orchestrators of the scheme and net winner investors).

{¶26} Historically, net losers, who by definition have received back less than their initial investment, have been insulated from avoidance claims brought by trustees or receivers, because a Ponzi investor is determined to have given value to the extent of his investment in the scheme, as the investment gives rise to an equitable claim against the Ponzi debtor which is satisfied by a transfer from the debtor. *See Donell* at 770; *Scholes v. Lehmann*, 56 F.3d 750, 753, 755 (1995) (applying statute based on the Uniform Fraudulent Conveyances Act, which was later replaced by the Uniform Fraudulent Transfers Act.); *In re Baker & Getty Fin. Servs., Inc.,* 88 B.R. 792, 796 (Bankr.N.D.Ohio 1988) (applying Ohio's Fraudulent

Conveyances Act, which was later replaced by the OFTA.). The UFTA and the state statutes modeled after it shift the burden on the Ponzi investor to prove good faith to retain amounts representing a return of the principal investment that a bankruptcy trustee or receiver is attempting to avoid as an actual fraudulent transfer. *Donell* at 771; Mark A. McDermott, *Ponzi Schemes and the Law of Fraudulent and Preferential Transfers*, 72 Am.Bankr. L.J. 157, 173 (1998).

{¶27} The Thomases do not cite any case in which one victim of a Ponzi scheme has been able to bring a separate, individual lawsuit against another net loser of a Ponzi scheme for restitution based on a fraudulent transfer and unjust enrichment and seeking the restitutionary remedy of a constructive trust. Likewise, we have found no cases.

{¶28} Although the Thomases maintain that the Supreme Court's discussion of tracing in *Cunningham* supports such a claim, there are significant differences between the factual scenario discussed in the *Cunningham* case with respect to tracing and the alleged facts in this case. To grant the Thomases the relief they seek, the trial court would have had to impose a constructive trust on property outside of the Ponzi fraudster's account, which is different from what was suggested in *Cunningham*. Further, *Cunningham* did not address tracing as between members of a class of net losers after distributions have been accepted in the class actions.

{¶29} As set forth in the amended complaint, the class of Net Losers— including the Thomases, Othman, and Woehler—have filed lawsuits against Galemmo and others to recoup assets to satisfy their claims against Galemmo. Several of these state court class actions were consolidated with the federal court class action. A partial distribution of recouped assets has been made, with other distributions to follow.

{¶30} The Thomases now want to litigate in a separate forum and without the other class members their restitutionary claim to money that was a part of the assets Galemmo controlled. And they seek a restitutionary remedy that would conflict with the settlement in the class actions. If the trial court imposed a "constructive trust" in the Thomases' favor in funds allegedly held by Othman and Woehler, the court would alter the net loss amounts of the parties. This would result in the Thomases having received a greater pro rata share of the previously distributed assets of the scheme than the other class-action members.

{¶31} The Thomases recognize this effect to some extent, admitting that they filed this lawsuit because of their frustration with the outcome in the class-action cases, including the treatment of the money Othman and Woehler had received from Galemmo and that the Thomases characterized as their own investment funds. They argue, however, that the impact on the class-action judgment would be minimal, and that this lawsuit involves separate issues—only their claim against Othman and Woehler in specifically identified property. But at its essence, this case involves the identification and treatment of what was Galemmo's property, what was the Thomases' property, and what was Othman's and Woehler's property.

{¶32} Allowing the Thomases to proceed on these claims in this case would allow a collateral attack on the settlement in the class-action cases. Although Woehler and Othman did not use the specific phrase "collateral attack doctrine" in the trial court proceedings, their position in part was based on the rationale underpinning this doctrine.

{¶33} A collateral attack on a judgment is different from a direct attack on a judgment, which is accomplished by the taking of an appeal or moving for a new

trial. *See Ohio Pyro, Inc. v. Ohio Dept. of Commerce, Div. of State Fire Marshal*, 115 Ohio St.3d 375, 2007-Ohio-5024, 875 N.E.2d 550, ¶ 17-18. Generally, the collateral-attack doctrine "disfavors the authority of one court to revisit the judgment of another court, in another proceeding, in other than very limited circumstances." *Id.* at ¶ 1. These limited circumstances may be present when there is a challenge to the "fundamental validity" of the previous judgment, *id.* at ¶ 25, or similar exceptional circumstances. *Id.* at ¶ 23 and 30.

{¶34} In this action, the Thomases do not challenge the "fundamental validity" of the prior judgments in the class-action cases, or present any similar exceptional circumstances that would allow a collateral attack. For instance, there is no claim that the other courts lacked jurisdiction, that the rulings in those cases were the product of fraudulent conduct, or that there was a failure of due process. Yet, as Othman and Woehler argued, in this case the Thomases are attempting to "circumvent" the settlement in those class-action cases of which they were members of the settling class and have taken distributions.

{¶35} We understand the difficulties inherent in obtaining justice for all of the multiple fraud victims created by Galemmo's Ponzi scheme. These difficulties have long been recognized in litigation involving other Ponzi schemes, litigation that has mostly been resolved under one umbrella in the bankruptcy courts. Here, the relief the Thomases requested would result in a judgment that conflicts with the rulings in the other cases, as it would alter the amount of parties' losses and undermine the settlement providing pro rata distributions based on those losses for the parties, all without the involvement of the other class members.

{¶36} We hold, therefore, that the trial court in this case lacked the authority to grant the relief requested by the Thomases in their attempt to recover from

Othman and Woehler money that would affect the amount of the parties' losses already determined in the class-action cases and allow the Thomases to recover more than the pro rata share that has already been determined in the class-action settlement. The Thomases accepted the pro rata distributions that settled the class-action cases, despite knowing of their purported claims against Othman and Woehler, and are now impermissibly seeking relief in a separate action that directly conflicts with that settlement.

{¶37} The Thomases have not sufficiently pled any cause of action against Woehler and Othman that is not tied to what is at its essence a claim that the other courts erred by not fully recognizing their claim for equitable relief in money transferred by Galemmo to Woehler and Othman in carrying out the Ponzi scheme. Thus, because the Thomases' complaint does not state a valid claim upon which relief can be granted, the trial court did not err by dismissing it. *See Ohio Pyro*, 115 Ohio St.3d 375, 2007-Ohio-5024, 875 N.E.2d 550, at ¶ 38. Thus, we overrule the assignments of error.

### III. Conclusion

{¶38} Accordingly, the judgment of the trial court is affirmed.

Judgment affirmed.

**MYERS** and **MILLER, JJ.,** concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.