[Cite as *Plush v. Cincinnati*, 2020-Ohio-6713.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

RON PLUSH, Individually and as
Administrator of the Estate of Kyle
Plush,

  and

JILL PLUSH, Individually,

    Plaintiffs-Appellees,

  vs.

CITY OF CINCINNATI,

HARRY BLACK,

AMBER SMITH,

STEPHANIE MAGEE,

EDSEL OSBORN,

  and

BRIAN BRAZILE,

    Defendants-Appellants.

:     APPEAL NO. C-200030
     TRIAL NO. A-1903752

:     *O P I N I O N.*

Civil Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed in Part, Reversed in Part, and Cause
Remanded

Date of Judgment Entry on Appeal:  December 16, 2020

*Gerhardstein & Branch Co. LPA, Alphonse A. Gerhardstein, Jennifer L. Branch* and
*M. Caroline Hyatt*, for Plaintiffs-Appellees,

*Paula Boggs Muething*, City Solicitor, *Peter J. Stackpole*, *Emily Smart Woerner* and *Mark R. Manning*, for Defendants-Appellees City of Cincinnati, Harry Black, Amber Smith, and Stephanie Magee,

*Lazarus & Lewis* and *Kimberly A. Rutowski,* for Defendants-Appellees Edsel Osborn and Brian Brazile.



**CROUSE, Judge.**

{¶1} The city of Cincinnati, Harry Black, Amber Smith, Stephanie Magee, Edsel Osborn, and Brian Brazile ("appellants") appeal the trial court's denial of their motion to dismiss. We find that Ron and Jill Plush's ("the Plushes") claims squarely attack the city of Cincinnati's ("the city") provision of emergency medical or rescue services, which is shielded by governmental immunity. Therefore, we reverse the denial of appellants' motion to dismiss as to the city and its employees in their official capacities. However, the complaint sufficiently alleges at least reckless conduct to preclude immunity as to the individual defendants. Therefore, appellants' motion to dismiss was properly denied as to Harry Black, Amber Smith, Stephanie Magee, Edsel Osborn, and Brian Brazile, in their individual capacities.

### I.

{¶2} The complaint alleges the following facts:

{¶3} On April 10, 2018, Kyle Plush parked his van in the sophomore parking lot at Seven Hills School. Kyle attempted to retrieve some items from the rear of the van when the back seat folded up on him. The back seat pinned Kyle against the back door, rendering him unable to move the seat or his body. The seat also reduced Kyle's ability to breathe.

{¶4} Kyle used the Siri function on his cell phone to place two 911 calls. Defendant Magee took the first call at 3:14 p.m. When Magee answered the call, Kyle was banging and yelling for help. Kyle told Magee, "I am trapped in my van. * * * I'm in desperate need of help. * * * I am going to die soon." Magee identified Kyle's location as 5471 Red Bank Road before the call disconnected at 3:17 p.m. Magee called back but received Kyle's voicemail message.

{¶5} At 3:21 p.m., Magee labeled the call "unknown trouble" and classified the call as Code 2. She also entered the following information in the computer aided dispatch ("CAD") system: "PCO HEARD FEMALE STATING, 'HELP HELP I'M STUCK INSIDE MY VAN, I'M IN SEVEN HILLS PARKING LOT' LOC FROM PHASE 2, COMP KEPT STATING SHE WAS UNABLE TO HEAR PCO, CALLER H/U, VM ON CB." At 3:22 p.m., Magee added the following information into the CAD system: "POSS IN THRIFT STORE PARKING LOT ACROSS FROM SCHOOL."

{¶6} Defendants Cincinnati Police Officers Osborn and Brazile arrived on the scene at 3:26 p.m. Without exiting from their patrol vehicle, the officers searched the south end of the sophomore parking lot and several other parking lots on the opposite side of the street. But they failed to search the north end of the sophomore lot where Kyle was parked. The officers called Kyle's cell phone and received his voicemail message. The officers then spoke with an off-duty deputy, who was directing traffic. The deputy said he had not seen anything.

{¶7} At 3:34 p.m., while the officers were still on the scene, Defendant Smith took the second 911 call. Smith heard Kyle again ask for help and say he was in the Seven Hills parking lot. Nonetheless, Smith activated the TTY function as if it were a silent call. Smith then ended the call. Smith called back and heard Kyle's voicemail message. She attempted to record the call and enter it as an advised run, but the CAD system froze. Smith then looked up previous runs for Kyle's number and located the first call handled by Magee. Despite seeing the first call, Smith never notified her supervisor or informed the officers of the second 911 call.

{¶8} The officers subsequently cleared the scene at 3:37 p.m.

{¶9} Later that evening, plaintiffs-appellees Ron and Jill Plush used the "Life 360" app to locate Kyle's cell phone. They identified Kyle's location and drove to Seven

4

Hills School. At approximately 8:56 p.m., Ron discovered Kyle trapped in the van. With help from a school employee, Ron removed Kyle and unsuccessfully attempted CPR. Kyle had died from "mechanical asphyxiation."

{¶10} On August 12, 2019, the Plushes filed a wrongful-death action against the city, then-city manager Black, Magee, Smith, Osborn, and Brazile. The city and its employees filed a Civ.R. 12(B)(6) motion to dismiss, arguing that they were entitled to governmental immunity under R.C. Chapter 2744. Following a hearing, the trial court denied appellants' motion to dismiss. The court found that the complaint alleged facts sufficient to overcome political subdivision immunity and individual immunity. Appellants now appeal.

## II.

{¶11} In their sole assignment of error, appellants challenge the trial court's denial of their motion to dismiss and contend that they are entitled to immunity under R.C. Chapter 2744.

{¶12} We review a trial court's ruling on a Civ.R. 12(B)(6) motion to dismiss de novo. *Myrick v. Cincinnati*, 1st Dist. Hamilton No. C-080119, 2008-Ohio-6830, ¶ 7. A Civ.R. 12(B)(6) motion to dismiss tests the sufficiency of the complaint. *Thomas v. Othman*, 2017-Ohio-8449, 99 N.E.3d 1189, ¶ 18 (1st Dist.). When ruling on a motion to dismiss, the trial court is confined to the allegations in the complaint. *Id.* It must accept the complaint's factual allegations as true and draw all reasonable inferences in favor of the nonmoving party. *Id.* For a court to dismiss a complaint under Civ.R. 12(B)(6), "it must appear beyond a doubt from the complaint that the plaintiff can prove no set of facts entitling him to recovery." *O'Brien v. Univ. Community Tenants Union, Inc.*, 42 Ohio St.2d 242, 327 N.E.2d 753 (1975), syllabus.

{¶13} A trial court may grant a motion to dismiss on the basis of an affirmative defense, such as immunity, only where the complaint bears "conclusive evidence that the action is barred by the defense." *Bucey v. Carlisle*, 1st Dist. Hamilton No. C-090252, 2010-Ohio-2262, ¶ 9. So "unless the pleadings obviously or conclusively establish the affirmative defense," a court may not grant a dismissal. (Internal quotations omitted.) *Steele v. City of Cincinnati*, 1st Dist. Hamilton No. C-180593, 2019-Ohio-4853, ¶ 15.

{¶14} The nonmoving party is not required to affirmatively dispose of the immunity question at the pleading stage. *Scott v. Columbus Dept. of Pub. Util.*, 192 Ohio App.3d 465, 2011-Ohio-677, 949 N.E.2d 552, ¶ 8 (10th Dist.). "Requiring a plaintiff to affirmatively demonstrate an exception to immunity at this stage would be tantamount to requiring the plaintiff to overcome a motion for summary judgment at the pleading stage. Instead, a plaintiff must merely allege a set of facts that, if proven, would plausibly allow for recovery." *Id.*

### III.

{¶15} We first address appellants' argument regarding immunity of the city and its employees in their official capacities.[1]

{¶16} R.C. 2744.02 sets forth a three-tiered analysis for determining whether a political subdivision is immune from liability. The first tier affords political subdivisions a general grant of immunity from civil actions. *See* R.C. 2744.02(A)(1). The second tier provides five exceptions to the grant of general immunity. *See* R.C. 2744.02(B). The third tier allows immunity to be reinstated if any of the defenses in R.C. 2744.03 apply.

---

[1] We note that political-subdivision employees sued in their official capacities are entitled to the same immunity due to the political subdivision. *Lambert v. Clancy*, 125 Ohio St.3d 231, 2010-Ohio-1483, 927 N.E.2d 585, ¶ 17-22.

**{¶17}** It is undisputed that the city is a political subdivision entitled to a general grant of immunity under R.C. 2744.02(A)(1). However, the parties disagree as to whether one of the exceptions set forth in R.C. 2744.02(B) applies to remove immunity. The city argues that none of the exceptions set forth in R.C. 2744.02(B) apply. The Plushes argue that two of the exceptions set forth in R.C. 2744.02(B) apply, namely R.C. 2744.02(B)(5) and (B)(4).

A.

**{¶18}** First, the Plushes assert that the city and its employees in their official capacities are liable under R.C. 2744.02(B)(5). R.C. 2744.02(B)(5) provides: "[A] political subdivision is liable for injury, death, or loss to person or property when civil liability is expressly imposed upon the political subdivision by a section of the Revised Code[.]" The Plushes allege that the city operated a faulty and inadequate 911 system, for which the General Assembly expressly imposed liability under R.C. 128.32(A)(1).

**{¶19}** R.C. 128.32(A)(1) provides: "[A political subdivision and any employee of a political subdivision] is not liable in damages in a civil action for injuries, death, or loss to persons or property arising from any act or omission, except willful or wanton misconduct, in connection with developing, adopting, or approving any final plan or any agreement made under section 128.09 of the Revised Code or otherwise bringing into operation the 9-1-1 system pursuant to this chapter."

**{¶20}** The Plushes contend that the latter portion of this subsection expressly imposes liability upon a political subdivision for misconduct relating to the operation and continuing development of a 911 system. Conversely, the city contends that this subsection imposes liability only for misconduct relating to the creation of a 911 system, not to subsequent improvements to the 911 system. We agree with the city.

7

{¶21} "[I]t is a settled principle of statutory construction that words used in a statute are to be given their plain and ordinary meaning[.]" *Ohio Assn. of Public School Emps., Chapter No. 672 v. Twin Valley Local School Dist. Bd. of Edn.*, 6 Ohio St.3d 178, 181, 451 N.E.2d 1211 (1983). Here, the General Assembly made R.C. 128.32(A)(1) applicable to willful or wanton misconduct in connection with "bringing into operation the 9-1-1 system." Under the plain and ordinary meaning of the phrase, to "bring into" being is to "create." *Merriam-Webster's Online Dictionary,* https://www.merriam-webster.com/dictionary/create (accessed Nov. 20, 2020). We must "presume that the legislature says in a statute what it means and means in a statute what it says there." (Internal quotations omitted.) *State ex rel. Lee v. Karnes*, 103 Ohio St.3d 559, 2004-Ohio-5718, 817 N.E.2d 76, ¶ 27. Therefore, we must conclude that the General Assembly intended to limit a political subdivision's liability to willful and wanton misconduct relating to the creation of a 911 system.

{¶22} A review of the other subsections in R.C. 128.32 bolsters this interpretation. These subsections deal with the liability of other entities in connection with the continuing development or maintenance of a 911 system. For instance, R.C. 128.32(A)(2) limits the liability of a steering committee and its members to willful or wanton misconduct in connection with the "development or operation of a 9-1-1 system." In a similar vein, R.C. 128.32(C)(1) limits the liability of a telephone company, or service provider, and its agents to willful or wanton misconduct in connection with "participating in or developing, maintaining, or operating a 9-1-1 system." Unlike R.C. 128.32(A)(2) and 128.32(C)(1), however, R.C. 128.32(A)(1) limits the liability of a political subdivision to willful or wanton misconduct in connection with "bringing into operation the 9-1-1 system." The General Assembly could have expanded a political subdivision's liability to acts in connection with "the operation of" or "participating in,

8

developing, maintaining, or operating a 9-1-1 system." It chose otherwise. The General Assembly's choice of the phrase "bringing into operation" thus demonstrates its intent to narrowly limit the liability of a political subdivision.

{¶23} Honing in on the word "developing" in R.C. 128.32(A)(1), the Plushes argue that the General Assembly did intend to extend liability to acts in connection with the development and maintenance of a 911 system. However, the term "developing" modifies the final plan or agreement under R.C. 128.09, not the operation of the 911 system. A review of R.C. Chapter 128 in its entirety demonstrates that the final plan and agreement under R.C. 128.09 concern only the creation of a 911 system.

{¶24} Under R.C. 128.06(A), a board of county commissioners may decide to convene a 911 planning committee. The sole purpose of the committee is to develop a final plan for implementing a countywide 911 system. R.C. 128.06(B). The final plan must specify the technical aspects of implementing the 911 system—e.g., the telephonic network of the system; the location, number, and inner workings of public safety answering points; and the funding for the system. *See* R.C. 128.07(B).

{¶25} If the countywide final plan is not approved, then a municipality or township may establish a local 911 system. R.C. 128.08(B). To establish a 911 system, the locality may enter into an agreement under R.C. 128.09. R.C. 128.09 allows for an agreement between the locality and a telephone company for the provision of the telephonic portion of a 911 system.

{¶26} Thus, the final plan and agreement under R.C. 128.09 are means of establishing a 911 system. Neither the final plan nor an agreement under R.C. 128.09 relates to the continuing development or maintenance of a 911 system. Consequently, when reading R.C. 128.32(A)(1) as a whole, it is clear that the General

Assembly intended to likewise limit the phrase "bringing into operation" to the creation of the 911 system.

{¶27} Because this case does not involve allegations regarding the creation of the city's 911 system, the immunity exception contained in R.C. 2744.03(B)(5) does not apply.

B.

{¶28} Second, the Plushes assert that the city and its employees in their official capacities are liable under R.C. 2744.02(B)(4). R.C. 2744.02(B)(4) provides: "[P]olitical subdivisions are liable for injury, death, or loss to person or property that is caused by the negligence of their employees and that occurs within or on the grounds of, and is due to physical defects within or on the grounds of, buildings that are used in connection with the performance of a governmental function[.]"

{¶29} To establish the physical-defect exception, a plaintiff must allege that the injury or death was (1) caused by an employee's negligence, (2) in or on the grounds of buildings used in connection with a governmental function, and (3) due to a physical defect within or on the grounds of those buildings. *R.K. v. Little Miami Golf Ctr.*, 2013-Ohio-4939, 1 N.E.3d 833, ¶ 15 (1st Dist.). "All of these characteristics must be present." *Parmertor v. Chardon Local Schools*, 2016-Ohio-761, 47 N.E.3d 942, ¶ 14 (11th Dist.), citing *Duncan v. Cuyahoga Community College*, 2012-Ohio-1949, 970 N.E.2d 1092, ¶ 26 (8th Dist.).

{¶30} With respect to the second prong, the Plushes advanced two arguments. First, they contend that Kyle's death occurred on the "virtual" grounds of the 911 system. However, Kyle's death did not occur during the course of the 911 call. Instead, Kyle's death occurred after the conclusion of the second 911 call, in a parking lot at Seven Hills School. According to the complaint, Kyle was still alive when the officers left the scene at

3:37 p.m. The complaint states that Kyle accessed the Siri application between 3:38 p.m. and 3:43 p.m. Therefore, even if we decided that R.C. 2744.02(B)(4) extends to the virtual grounds of a public building (on which we take no position today), it would not help the Plushes in this case. *See Svette v. Caplinger*, 4th Dist. Ross No. 06CA2910, 2007-Ohio-664 (finding R.C. 2744.02(B)(4) inapplicable where the injury occurred on a state route, not within the dispatch center).

{¶31} Alternatively, the Plushes contend that Kyle's death occurred on the grounds of a parking lot used in connection with the performance of a governmental function, namely the operation of a school athletic facility. However, Kyle's death occurred within a parking lot owned by Seven Hills School, a private academy. And "[t]he performance of a governmental function at a privately owned facility does not transform that building into one that is 'used in connection with the performance of a governmental function.' " *Dornal v. Cincinnati Metro. Hous. Auth.*, 1st Dist. Hamilton No. C-100172, 2010-Ohio-6236, ¶ 14. Therefore, the second characteristic of the physical-defect exception cannot be established.

{¶32} Because the Plushes cannot establish the second characteristic, the immunity exception contained in R.C. 2744.02(B)(4) does not apply. Therefore, the city and its employees in their official capacities are immune from liability.

### *IV.*

{¶33} We next address appellants' argument regarding immunity of Harry Black, Stephanie Magee, Edsel Osborn, Brian Brazile, and Amber Smith, in their individual capacities.

{¶34} The immunity-analysis differs for the individual employees of political subdivisions. *Rankin v. Cuyahoga Cty. Dept. of Children and Family Servs.*, 118 Ohio St.3d 392, 2008-Ohio-2567, 889 N.E.2d 521, ¶ 36. Instead of the three-tiered analysis,

R.C. 2744.03(A)(6) provides a general grant of immunity to an employee of a political subdivision unless one of the following exceptions applies: (1) the employee's actions or omissions are manifestly outside the scope of employment or the employee's official responsibilities, (2) the employee's acts or omissions were malicious, in bad faith, or wanton or reckless, or (3) liability is expressly imposed upon the employee by a section of the Revised Code. *Id.*

{¶35} This case turns on the second exception: whether the individual defendants acted wantonly or recklessly in performing their duties. In *Anderson v. Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711, 983 N.E.2d 266, the Ohio Supreme Court defined the terms "wanton" and "reckless" for purposes of the political-subdivision-immunity statute. The court determined that the terms "are not interchangeable." *Id.* at ¶ 40. Instead,

Wanton misconduct is the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result. *Hawkins* [*v. Ivy*, 50 Ohio St.2d 114, 117-118, 363 N.E.2d 367 (1977)]; *see also Black's Law Dictionary* (8th Ed.2004) (explaining that one acting in a wanton manner is aware of the risk of the conduct but is not trying to avoid it and is indifferent to whether harm results).

Reckless conduct is characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct. *Thompson* [*v. McNeill*, 53 Ohio St.3d 102, 559 N.E.2d 705 (1990)], adopting 2 Restatement of the Law 2d, Torts, at 587 (1965); *see also Black's Law Dictionary* (8th Ed.2004) (explaining that reckless

conduct is characterized by a substantial and unjustifiable risk of harm to others and a conscious disregard of or indifference to the risk, but the actor does not desire harm).

*Anderson* at ¶ 33-34. *See A.J.R. v. Lute*, Slip Opinion No. 2020-Ohio-5168, ¶ 17.

{¶36}   After reviewing the complaint, and taking all of the factual allegations as true, we find that the Plushes sufficiently alleged at least reckless conduct by the individual defendants.

A.

{¶37}   Defendant Harry Black served as the city manager from 2014 to 2018. The complaint alleges that when Black was hired, he described the 911 system as "a mess" and stated that the emergency communication center ("ECC") "bordered on dysfunctional." The complaint also alleges that in January 2014, the director of the ECC warned Black of employee turnover and burnout, and Black vowed to fill the vacant positions. The complaint further alleges that in January 2016, the new director of the ECC reported that the ECC needed more money, more operators, and better training. According to the complaint, Black again vowed to fill the vacant positions, but as of April 2018, the ECC was still chronically understaffed. Finally, the complaint alleges that many operators were required to frequently work mandatory overtime hours, but despite numerous complaints, Black took no steps to resolve the staffing problem.

{¶38}   According to the complaint, the city's emergency communication system had several systemwide failures from 2016 to 2018. The complaint alleges that the ECC staff regularly experienced slowdowns of the CAD system, which delayed the transfer of data and the response to 911 calls, and freezes of the CAD system. According to the complaint, there were at least nine systemwide shutdowns between June 2016 and March 2017, which resulted in more than seven hours of no 911 emergency services. The

complaint alleges that Black knew about the pattern of systemwide failures and took no steps to resolve the problem.

{¶39} The complaint further alleges that the ECC was operating out of a backup 911 call center between March 2018 and April 2018. According to the complaint, call takers in the backup center had difficulty hearing calls and were instructed to use the TTY function if the call appeared to be a silent call. The TTY function allows communication with hearing-impaired callers using a TTY-enabled device. However, the TTY function also reduces the volume of the caller's voice by 75 percent. According to the complaint, ECC call takers were not adequately trained on the use of the TTY function, including when to disengage the function. The complaint alleges that Black knew about the inadequate training and again took no steps to resolve the problem.

{¶40} Taking the facts alleged in the complaint as true, Black's course of conduct shows a pattern of wanton or reckless actions (or rather, inactions). Black was aware of the extensive problems plaguing the ECC, including problems with understaffing, training, and technology malfunctions. Despite this knowledge, Black chose not to effectively remedy these problems. Based on these allegations, we find that the complaint sufficiently pleads facts that, if proven, demonstrate a conscious disregard, or indifference to, persons in need of emergency services, including Kyle.

B.

{¶41} Defendant Stephanie Magee was a call taker at the Cincinnati ECC. A review of the complaint shows Magee took Kyle's first 911 call at 3:14 p.m. According to the complaint, Magee heard Kyle banging, yelling for help, and stating "I'm in desperate need of help. * * * I am going to die soon." before the call disconnected at 3:17 p.m. The complaint alleges that Magee called back and received a voicemail message identifying the caller as "Kyle." The complaint further alleges that at 3:21 p.m., Magee labeled the

call "unknown trouble" and classified the call as Code 2. She then entered the following information in the CAD system: "PCO HEARD FEMALE STATING, 'HELP HELP I'M STUCK INSIDE MY VAN, I'M IN SEVEN HILLS PARKING LOT' LOC FROM PHASE 2, COMP KEPT STATING SHE WAS UNABLE TO HEAR PCO, CALLER H/U, VM ON CB." One minute later, Magee added the following information into the CAD system: "POSS IN THRIFT STORE PARKING LOT ACROSS FROM SCHOOL." According to the complaint, Magee had identified Kyle's location as 5471 Red Bank Road based on his cell phone GPS coordinates.

{¶42} While emergency call takers should not be held to a level of perfection, the complaint demonstrates more than mere negligent conduct by Magee. First, the complaint alleges that Magee omitted critical information from the CAD entry. Of most importance to the Plushes claims, the complaint alleges that Magee failed to portray the urgency and severity of the situation. Magee did not convey the fact that she could hear Kyle banging or that she heard Kyle say "I'm in desperate need of help. * * * I am going to die soon." Second, the complaint alleges that Magee misclassified the call as "unknown trouble," which triggered a police response instead of a rescue squad to extract Kyle from the van. These allegations, if proven, are sufficient to demonstrate a conscious disregard, or indifference to, a known risk of harm to Kyle.

C.

{¶43} Defendants Edsel Osborn and Brian Brazile were police officers for the city. A review of the complaint shows Osborn and Brazile were dispatched to the scene at 3:22 p.m. They arrived on the scene four minutes later, at 3:26 p.m. According to the complaint, dispatch provided the address as 5471 Red Bank Road—a location 12 parking spaces away from Kyle's van. The complaint alleges that the officers did not use the mapping function in their vehicle or the mapping tools on their cell phones to help them

15

locate Kyle's van. The complaint also alleges that they did not search the entirety of the thrift store parking lot, namely the north end where Kyle was parked. Instead, the officers searched only the south end of the lot and several other parking lots on the opposite side of the street. According to the complaint, the officers ate and played music while driving through the lots. The complaint further alleges that the officers called Kyle's cell phone and received his voicemail message. Finally, the complaint states that the officers spoke with an off-duty deputy, who was directing traffic nearby. According to the complaint, the deputy said he had not seen anything, and at 3:37 p.m., Osborn and Brazile cleared the scene.

{¶44} The facts alleged in the complaint demonstrate that the officers knew someone had called 911, told Magee "I'm stuck inside my van," and the call received a high-priority assignment. The complaint alleges that, despite this knowledge, Osborn and Brazile chose to not even utilize the Red Bank Road address provided by dispatch. Instead, they searched only half of the parking lot from the confines of their patrol vehicle. According to the complaint, Osborn and Brazile cleared the 911 call without ever searching the entire parking lot, leaving their patrol vehicle (which had music playing), looking into a van, or asking for more information from dispatch. Based on these allegations, we find that the complaint sufficiently pleads facts that, if proven, demonstrate a conscious disregard, or indifference to, an obvious risk of harm to Kyle.

{¶45} The dissent argues that the facts in the complaint do not allege reckless conduct because the complaint alleges that "much of the delineated conduct was common police practice, was the product of training, or resulted from the lack of equipment" and "sets forth a number of facts related to the calls that were not relayed to the officers on the scene." While these may be defenses that the officers

can raise at the summary-judgment phase, based on our analysis above, we cannot say that the complaint "obviously or conclusively" established that the officers were merely negligent and thus immune from liability. *Steele*, 1st Dist. Hamilton No. C-180593, 2019-Ohio-4853, at ¶ 15.

{¶46} Early resolution of whether employees of political subdivisions are immune from liability is an important consideration. *See Riscatti v. Prime Properties Ltd. Partnership*, 137 Ohio St.3d 123, 2013-Ohio-4530, 998 N.E.2d 437, ¶ 17 (discussing the importance of determining R.C. Chapter 2744 immunity before trial). However, the immunity question cannot always be determined at the earliest stage of litigation. Because immunity is a question of law, courts often need facts and evidence in order to make such a determination. *See, e.g., Harris Farms, LLC v. Madison Twp. Trustees*, 4th Dist. Scioto No. 17CA3817, 2018-Ohio-4123, ¶ 39 ("In the case sub judice, we have already pointed out that the facts, at this stage of the proceeding, are not adequately developed to allow any determination regarding the legal question of whether appellants are entitled to immunity. Although we recognize that the question of a political subdivision's statutory immunity generally presents a question of law, we do not believe that simply examining the pleadings allow us to resolve the immunity question.").

{¶47} At this stage in the proceedings, we are unable to conclude that the appellants cannot prove a set of facts to demonstrate that the officers may be held individually liable in this case.

D.

{¶48} Defendant Amber Smith was a call taker at the Cincinnati ECC. A review of the complaint shows Smith took Kyle's second 911 call at 3:34 p.m. According to the complaint, Smith heard Kyle ask for help and say he was in the Seven Hills parking lot. Nonetheless, Smith activated the TTY function as if it were a silent call, causing the

volume of Kyle's voice to be reduced. The complaint alleges that Smith hung up on Kyle without rendering any aid or recording any information. Smith then called back and heard Kyle's voicemail message. The complaint further alleges that Smith attempted to record the call and enter it as an advised run, but the CAD system froze. According to the complaint, Smith never notified her supervisor or informed the officers of the second call.

{¶49} Taking the facts alleged in the complaint as true, we find that Smith's course of conduct involved numerous missteps and a failure to follow established protocol. Smith improperly activated the TTY function, hung up without recording any information in the CAD system, and failed to play back the call at a higher volume. She also chose to not notify a supervisor when the CAD system froze or advise the on-scene officers of the second 911 call, despite locating the first 911 call handled by Magee. Based on these allegations, we find that the complaint sufficiently pleads facts that, if proven, demonstrate a conscious disregard, or indifference to, a known risk of harm to Kyle.

*V.*

{¶50} For the foregoing reasons, we sustain appellants' assignment of error as to the city of Cincinnati and its employees in their official capacities. However, we overrule appellants' assignment of error as to Harry Black, Amber Smith, Stephanie Magee, Edsel Osborn, and Brian Brazile, in their individual capacities. Accordingly, we affirm in part the judgment of the trial court, reverse in part the judgment of the trial court, and remand the cause for further proceedings consistent with this opinion.

Judgment accordingly.

**BERGERON, J.,** concurs.
**MOCK, P.J.,** concurs in part and dissents in part.

**MOCK, P.J.,** concurring in part and dissenting in part.

**{¶51}** I agree with the well-written majority opinion in all respects except for the question of the liability of police officers Edsel Osborn and Brian Brazile. I dissent from that portion of the opinion.

**{¶52}** The question presented is whether the officers' conduct was reckless as that term is used in R.C. 2744.03(A)(6)(b). The Ohio Supreme Court has stated that reckless conduct is

> characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct. *Thompson* [*v. McNeill*, 53 Ohio St.3d 102, 104-105, 559 N.E.2d 705 (1990)], adopting 2 Restatement of the Law 2d, Torts, Section 500, at 587 (1965); *see also Black's Law Dictionary* 1298-1299 (8th Ed.2004) (explaining that reckless conduct is characterized by a substantial and unjustifiable risk of harm to others and a conscious disregard of or indifference to the risk, but the actor does not desire harm).

*Anderson v. Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711, 983 N.E.2d 266, ¶ 34.

**{¶53}** Mere negligence in the performance of an employee's duties is insufficient to meet this high standard. *See O'Toole v. Denihan*, 118 Ohio St.3d 374, 2008-Ohio-2574, 889 N.E.2d 505, ¶ 74. An individual's conduct represents a " 'reckless disregard of the safety of others if * * * such risk is substantially greater than that which is necessary to make his conduct negligent.' " *Fabrey v. McDonald Village Police Dept.*, 70 Ohio St.3d 351, 356, 639 N.E.2d 31 (1994), quoting 2 Restatement of the Law 2d, Torts, Section 500, at 587 (1965).

{¶54} This court recently addressed the distinctions between reckless conduct and negligence. *See Kurz v. Great Parks of Hamilton Cty.*, 2016-Ohio-2909, 65 N.E.3d 96 (1st Dist.). In that case, then-Judge DeWine wrote that

The consciousness that conduct will likely cause injury is what distinguishes recklessness from negligence. The Ohio Supreme Court has cited with approval the following from the Second Restatement of Torts on the distinction between negligence and recklessness:

Reckless misconduct differs from negligence in several important particulars. It differs from that form of negligence which consists in mere inadvertence, incompetence, unskillfulness, or a failure to take precautions to enable the actor adequately to cope with a possible or probable future emergency, in that **reckless misconduct requires a conscious choice of a course of action, either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable man**. It differs not only from the above-mentioned form of negligence, but also from that negligence which consists in intentionally doing an act with knowledge that it contains a risk of harm to others, in that the actor to be reckless must recognize that his conduct involves a risk substantially greater in amount than that which is necessary to make his conduct negligent. The difference between reckless misconduct and

conduct involving only such a quantum of risk as is
necessary to make it negligent is a difference in the degree
of the risk, but this difference of degree is so marked as to
amount substantially to a difference in kind.

(Emphasis added.) *Marchetti v. Kalish*, 53 Ohio St.3d 95, 100, 559
N.E.2d 699 (1990), fn. 3, quoting 1 Restatement of Law 2d, Torts, Section
500, Comment g (1965).

*Id.* at ¶ 25.

{¶55} The complaint alleged that the conduct of the officers was reckless because they: (1) never exited from their patrol vehicle to look inside any of the parked vehicles located in the thrift store parking lot – especially vans; (2) failed to look through the entire thrift store lot and thus completely missed the van in which Kyle Plush stated he was trapped; (3) made an unreasonable assumption that the call involved a citizen having mechanical problems with their vehicle's locking mechanism; (4) never utilized the navigation button of the MDT that populates a map in the police vehicle; (5) failed to communicate with supervisory personnel regarding the status of the brief search; and (6) failed to communicate with supervisory personnel for clarification of a "Phase 2" action which was understood only by dispatch personnel.

{¶56} The problem with a finding of reckless misconduct under these facts is that, according to the complaint itself, much of the delineated conduct was common police practice, was the product of training, or resulted from the lack of equipment. The complaint alleged that the city had been at fault because the "[t]raining and supervision of police officers in the field failed to ensure they investigated call locations on foot when needed" and "failed to ensure they would locate addresses provided by dispatch on their MDCs using mapping technology." The complaint also alleged that the officers "had the

ability to display an address on a map in their vehicle, but consistent with custom and practice, the officers did not use the mapping function on their MDC." The complaint also stated that the city "did not train the officers or establish policies for officers to follow when investigating the calls labeled 'unknown trouble,' which was coded a high priority call." Further, "even though there were two 9-1-1 calls by Kyle Plush received at the ECC, the officers only received information from the first call." Finally, "Cincinnati police vehicles did not have GPS tracking software or automatic vehicle location software on April 10, 2018. This impeded the ability of the ECS to determine if the responding police vehicle was near the caller or the location to which it has been dispatched." The complaint summarizes the officers' conduct in the case as the result of "operational shortcomings, individually and collectively."

{¶57} The complaint also sets forth a number of facts related to the calls that were not relayed to the officers on the scene. The complaint sets forth that defendant Magee did not record any of the following information in her CAD entry: (1) that she could hear banging twice, (2) that she could hear Kyle scream for help twice, (3) the urgency in Kyle's voice, (4) that Kyle was in desperate need of help and that he was going to die soon, (5) that he pleaded for help 17 times, (6) that he repeatedly said he could not hear her, (7) her mapping detail with officers even though she knew that officers had maps on the MDC and could insert GPS coordinates, and (8) that the caller sounded far away from the phone, consistent with his claim with his that he was trapped. Furthermore, the initial call was classified as "unknown trouble" rather than as a "request for rescue." Additionally, the officers were not informed that a second 911 call had been received by Defendant Smith, and were given none of the details of that second call.

{¶58} The officers in this case were dispatched to the school with a complaint of a person trapped in a van. They searched the parking lot for over ten minutes and made inquiries of the deputy before leaving the scene. Clearly, as alleged in the complaint, this conduct was negligent. Especially when considering that the officers were listening to music and were eating during the search. But given the lack of information communicated to the officers, the state of the officers' training, the accepted practices in the department, and the lack of technology available to the officers at the time, it is hard to say that this conduct rises to a "conscious disregard of or indifference to a known or obvious risk of harm." As the Supreme Court stated, "[r]ecklessness requires knowledge by the actor that his 'conduct will in all probability result in injury.' " *Argabrite v. Neer*, 149 Ohio St.3d 349, 2016-Ohio-8374, 75 N.E.3d 161, ¶ 21, citing *O'Toole*, 118 Ohio St.3d 374, 2008-Ohio-2574, 889 N.E.2d 505, at paragraph three of the syllabus.

{¶59} The Ohio Supreme Court has set forth an "onerous" standard for establishing that a law enforcement officer is not entitled to immunity. *Argabrite* at ¶ 31. And there is no question that this case represents an unspeakable tragedy. When viewed in hindsight, knowing how high the stakes were at the time, the conduct of the officers can appear frustratingly cavalier and singularly frustrating in light of the outcome. They were Kyle's last hope for survival, and they failed to rescue him. But the test is not based on what we now know the stakes to have been, but rather what the officers understood at the time. The complaint attempted to bridge this lack of knowledge with the general assertion that "[i]t was unknown the extent that the 9-1-1 caller was in harm's way, but the fact that the caller made a distressed 9-1-1 call requesting help was sufficient evidence to require Osborn and Brazile to conduct a thorough search of the area before concluding that the call was unfounded." Such a

standard would place officers at an unreasonable risk for liability for every 911 call placed.

**{¶60}** As the allegations are set forth in the complaint before us, I cannot conclude that the allegations against the officers rise to the level of recklessness. I therefore dissent from that portion of the opinion.

Please note:

The court has recorded its own entry on the date of the release of this opinion.