[Cite as *Morrison v. Warrensville Hts.*, 2022-Ohio-1489.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

BORIS MORRISON,                          :

      Plaintiff-Appellee/Cross-    :
      Appellant,                           No. 110234

      v.                                           :

CITY OF WARRENSVILLE HEIGHTS,   :
ET AL.,

      Defendants-Appellants/       :
      Cross-Appellees.

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** May 5, 2022

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-18-908804

---

### *Appearances:*

Sonkin & Koberna, LLC, Mark R. Koberna, and Sean T. Koran, *for appellee/cross-appellant*.

Mazanec, Raskin and Ryder Co., L.P.A., James A. Climer, Frank H. Scialdone, John D. Pinzone, and Amily A. Imbrogno, *for appellant/cross-appellee*.

EMANUELLA D. GROVES, J.:

{¶ 1} Defendants-appellants employees of the city of Warrensville Heights appeal the denial of their motion for summary judgment in this wrongful death and

survivorship action. Cross-appellant Boris Morrison ("Morrison"), administrator for the estate of Betty L. Morrison, deceased, appeals the trial court's decision to grant summary judgment to cross-appellee city of Warrensville Heights (the "City"). For the reasons that follow, we affirm the decision of the trial court.

**Factual and Procedural History**

{¶ 2} On September 5, 2017, 71-year-old Betty L. Morrison ("Ms. Morrison") had a severe asthma attack. Ms. Morrison, a long-time resident of the City, called 911 and requested assistance. By the time EMS arrived, Ms. Morrison was unconscious and not breathing. Attempts to revive Ms. Morrison were ultimately unsuccessful. She was eventually transported to South Pointe Hospital where she was pronounced dead.

{¶ 3} At her funeral, Amelia Gray ("Gray"), Ms. Morrison's daughter, learned from a neighbor that EMS initially went to the wrong address. The neighbor reported that EMS spent several minutes at her home before eventually going to Ms. Morrison's. Gray, concerned about this information, obtained the EMS records of her mother's care. Gray discovered there were discrepancies between what she had learned from the neighbor and what was in the EMS reports. Seeking answers, Gray wrote to Fire Chief, Herbert Waugh ("Chief Waugh"), asking him to explain why the official report did not show EMS had gone to the wrong address or account for the time they spent at that address. Furthermore, she asked why the reports showed that it took several minutes for EMS to be dispatched to her mother's home.

{¶ 4} In response to Gray's letter, the City's Mayor, Bradley Sellers ("Mayor Sellers"), requested that the Cuyahoga County Sheriff's Department review the circumstances surrounding EMS's response to Ms. Morrison's 911 call. Mayor Sellers also requested that the sheriff's department "address any internal issues that may be discovered" during the investigation.

**Cuyahoga County Sheriff Department's Investigation**

{¶ 5} Cuyahoga County Sheriff's Department Deputy Courtney K. Sheehy ("Sheehy") who was tasked with the overview, finalized the investigation on May 17, 2018. Sheehy did an extensive review, obtaining the recorded 911 calls, dispatch calls, and reports created as a result of the incident. Sheehy also interviewed the employees involved in the incident, except Lynnesha Hamilton ("Hamilton"), the dispatcher, who declined to give a statement.

{¶ 6} Sheehy began by developing a timeline from the recorded calls. As a preliminary matter, Sheehy noted that there were discrepancies between the times labeled on the recorded calls and the times spoken by the dispatcher on the recordings. Sheehy surmised from interviews that these discrepancies occurred because the dispatcher was reading the time from a cell phone or a clock other than the one on the computer.

{¶ 7} Ms. Morrison's 911 call came in at 9:37:47 a.m. on September 5, 2017. The 911 system automatically time stamps incoming calls. Hamilton took the call. Despite having difficulty breathing and speaking, Ms. Morrison relayed that she was having an asthma attack and needed assistance. She also relayed that she was 71

years old and that her address was 19219 Lanbury. Hamilton repeated the address and indicated she was sending a squad.

**{¶ 8}** The investigation revealed that Hamilton's call to the fire station to dispatch an ambulance to Ms. Morrison's home was not recorded. Sheehy determined that this was likely caused by someone using a speakerphone during the call. Sheehy learned that if a speakerphone was used, by either dispatch or the fire station, the system would not record the call.

**{¶ 9}** The next recorded call came at 9:40:43 a.m. through channel seven (the Fire/EMS line). At that time, Squad 1, the ambulance carrying firefighters David Rancourt Jr. ("Rancourt") and Nicholas Kaminsky ("Kaminsky"), radioed dispatch and stated, "responding 19419 Lanbury," instead of "responding 19219 Lanbury." In the same recording, Hamilton responded with "9:42." Hamilton did not correct the address. Sheehy attributed the difference in times to Hamilton looking at a wall clock or cell phone, rather than the clock on the computer.

**{¶ 10}** At 9:43:46, Squad 1 radioed dispatch indicating they were "on scene." They did not restate the address during this call. By using Google Maps, Sheehy determined that 19419 Lanbury was approximately 1.3-1.6 miles and a three-to-five-minute drive from the fire station. Sheehy calculated that with lights and sirens it took Squad 1 approximately 3 minutes to get to 19419 Lanbury. Dispatch did not acknowledge or respond to this call.

{¶ 11} At 9:45:39 a.m., Squad 1 radioed dispatch and requested an address check. At 9:45:59 a.m., Hamilton responded stating "19219, 19219." Squad 1 responded at 9:46:10 a.m. with "Alright, copy that, 19219, thank you."

{¶ 12} At 9:47:08 a.m., Squad 1 advised dispatch that they were on scene at 19219 Lanbury. Again, using Google Maps, Sheehy determined that the two addresses were about eight houses apart. Sheehy noted that in less than a minute, Squad 1 loaded their equipment back on the ambulance and drove to Ms. Morrison's home. Dispatch responded to the call by stating, "Copy at 9:49." Sheehy noted the difference in the times, again suggesting that this was likely due to the dispatcher reading the time from a cell phone, wall-mounted clock, or a clock other than the one on the computer.

{¶ 13} Determining that Ms. Morrison was in full cardiac arrest, and she needed additional assistance, Squad 1 radioed the fire station at 9:48:24 a.m. Engine 1, carrying Lt. Pete Patrick ("Lt. Patrick") and Omar Jordan ("Jordan"), arrived on scene at 9:53:10 a.m. Squad 1 advised Engine 1 to bring in the Lucas (a machine that performs chest compressions). Squad 1 subsequently radioed dispatch at 10:06:09 a.m. that they were en route to the hospital. At 10:08:41 a.m. they radioed dispatch that they had arrived at the hospital.

{¶ 14} Next, Sheehy reviewed the EMS Run Report ("run report"), a document that catalogs the particulars of the call, including the times that certain events occurred. The report was completed and electronically signed by Rancourt on September 5, 2017, at 2:32 p.m. The run report indicated that the 911 call was

both received and dispatched at 9:40 a.m., rather than 9:37 a.m. Rancourt reported that EMS was en route to the residence at 9:40 a.m. Further, he indicated that EMS was at 19219 at 9:44 a.m., rather than 9:47 a.m. According to the report, Squad 1 left the residence at 10:08 a.m. and arrived at the hospital at 10:11 a.m. Sheehy noted that there was only one indication on the report that there was an error with the address. On page three of the report under a section titled "Dispatch Factors," Rancourt noted, "Location (Inability to obtain)."

{¶ 15} To get a better understanding of how the department operates, Sheehy interviewed the firefighters involved in Ms. Morrison's call. The firefighters reported that when dispatchers call, they typically call over the police line, which has a special ring tone, which notifies them that it is an emergency. At the time of Ms. Morrison's incident, the City did not relay emergency call information via email or text. When the calls would come through, whoever answered the phone would either pick up the handset or use the speakerphone. There was also an intercom that firefighters used to broadcast call information to the entire department; however, the intercom often did not work.

{¶ 16} Typically, firefighters would write the address and other pertinent information on two pieces of scrap paper near the phone. Usually, if only one team was assigned to the call, that team would take one piece of paper with them. The other piece of paper would remain at the station, where a firefighter would input the information on that sheet into an informal logbook the fire station kept to keep track

of calls. Whoever was monitoring the logbook was also supposed to listen to the dispatch calls and input the information into the logbook as it happened.

{¶ 17} To get an understanding of the duties of City dispatchers, Sheehy reviewed the "City of Warrensville Heights Employee Job Description for Dispatchers." Dispatchers are employed by and work under the supervision of the police department. According to that document, dispatchers' primary duties included "dispatching for police and fire, answering 911 calls, answering calls for citizen complaints (nonemergency lines), and complaints of flooding, storm damage, broken utility lines and notify the appropriate departments or resources for investigation and repair." Additional primary responsibilities included operating the computer terminal for Law Enforcement Automated Data Systems ("LEADS"), and other law enforcement-related computer systems, preparing warrants and reports as necessary, maintaining a record of community activity, and preparing, recording, and maintaining a computerized record of stolen property. Further, dispatchers were responsible for assisting persons who walk into the station. Secondary responsibilities included oversight of prisoners as needed, including arrangements for food, care, and jail inspections.

{¶ 18} Sheehy learned that in September 2017, the City scheduled one dispatcher per shift. The firefighters interviewed reported multiple issues with dispatch. In general, firefighters noted that dispatchers could easily become overwhelmed due to the number of duties they were assigned. There were multiple incidents where dispatchers failed to respond to their radio calls and times when

EMS and Fire went to the wrong address because either dispatch relayed the wrong address or firefighters wrote down the wrong address.

{¶ 19} When Sheehy asked firefighters about specific incidents, they reported a number of concerns. Jordan described an incident where he was on a call when gunshots were heard. Dispatch did not respond to his calls into the station because they were in the jail handling required prisoner care. Jordan told Sheehy, that in that incident, he feared for his life. Jordan indicated that dispatch failing to respond to calls happened several times a month. Further, he noted that leadership, including Waugh, was well aware of these issues. He also told Sheehy that firefighters were forced to rely on understaffed and possibly undertrained people in the dispatch department. Kaminsky noted EMS/Fire went to the wrong address two to three times per month. He could recall more than 20 incidents of going to the wrong address, more incidents than any he observed at the six other fire departments where he had worked. Kaminsky indicated leadership was aware of the address issue as well.

{¶ 20} Sheehy asked Waugh to provide a copy of the fire department's policies and procedures. Waugh only sent EMS protocols. Furthermore, those protocols consisted of a link to EMS protocols created and utilized by the Cleveland Clinic for medical care. Sheehy never received any other policies regarding dispatching of calls from the fire department, emergency response procedures, or any other procedures. Sheehy also requested but did not receive any policies or procedures for dispatchers.

{¶ 21} Sheehy interviewed the four firefighters about the training they received. Firefighters reported that almost all of the training was on-the-job training. Lt. Patrick indicated that new firefighters are given a manual that includes streets within the city. However, he noted there were not many written policies and procedures, and most things were communicated by "word of mouth." Kaminsky described the new firefighter manual as an introduction to the station, not a mandated policies and procedures manual. He also told Sheehy that there were no written policies and procedure manual. Jordan agreed that there were no written policies or procedures and that most training was by "word of mouth." Rancourt was aware of only one written policy that involved evacuation.

{¶ 22} Firefighters also identified issues with equipment. Lt. Patrick noted that calls from dispatch to the station can be heard throughout the station; however, sometimes the speakers/intercom did not work. Sometimes, according to Lt. Patrick, the fire/EMS line volume would be turned down so it could not be heard by dispatch. Lt. Patrick described the equipment as "1960s technology" and noted that the procedures for processing or dispatching calls had not changed in the 23 years he had been with the department. Kaminsky described the equipment as "archaic." Jordan indicated that even in 1997 when he worked at the Twinsburg Fire Department, Twinsburg had direct alerting technology like Active 911, a system that relays the details of 911 calls electronically directly to the fire department.

{¶ 23} Sheehy summarized "Systemic Failures at Warrensville Heights" as follows:

Lack of training, equipment and policies and procedures. Lack of properly functioning equipment from speakers inside Station 1 to no computers or linked GPS units inside any Engine, ladder or Squad. [Firefighters] have to hope that Speakers are working to hear the address of a call they are being dispatched to. There is no system of checks and balance [sic]. If an address is communicated incorrectly by dispatch or writing [sic] down incorrectly by firefighters there is no other written or electronic check on that address. There is a check when [firefighters] radio to dispatch they are enroute to a call but if dispatch does not hear this traffic and does not respond or doesn't make the correction to an incorrect address being stated then the same error will be made.

{¶ 24} Despite these issues, Sheehy determined that there was insufficient evidence for criminal charges against the employees for their actions during this incident.

**The Morrison Family Civil Complaint**

{¶ 25} On December 24, 2018, Morrison, the administrator of the estate of Ms. Morrison, filed a complaint against the City, Mayor Sellers, Chief Waugh, Hamilton, Rancourt, and Kaminsky. The complaint alleged willful and wanton misconduct against the City; willful; wanton; reckless misconduct; wrongful death, and survivorship against Mayor Sellers, Chief Waugh, Hamilton, Rancourt, and Kaminsky. On May 22, 2019, Morrison filed an amended complaint adding Police Chief Wesley Haynes ("Chief Haynes") to the action alleging willful, wanton, and reckless misconduct, wrongful death and survivorship. Morrison eventually dismissed Mayor Sellers from the complaint.

{¶ 26} On December 13, 2019, the defendants filed a motion for summary judgment. The City argued that it was entitled to political subdivision immunity

under RC 2744.02(A)(2) and that none of the exceptions to immunity under RC 2744.02(B) applied. With respect to Hamilton, Kaminsky, and Rancourt (collectively, the "Emergency Service Employees") and Chief Waugh and Chief Haynes (the "Chiefs"), these defendants claimed that they were entitled to immunity under R.C. 2744.03(A)(6). Additionally, the Chiefs claimed they were not liable under theories of vicarious liability and respondeat superior. Also, the Chiefs alleged they were entitled to common law public official immunity.

{¶ 27} In response, Morrison filed an opposition to the motion for summary judgment on January 10, 2020. He argued that the City was not entitled to immunity under R.C. 2744.02 because exceptions under R.C. 2744.02(B)(5) applied.

{¶ 28} Morrison claimed that the Emergency Service Employees were not entitled to summary judgment under R.C. 2744.03(A)(6) because there were genuine issues of material fact regarding whether their conduct was wanton, reckless, or done in bad faith.

{¶ 29} With respect to the Chiefs, Morrison disagreed with their contention that the claim was based on vicarious liability or respondeat superior. Morrison argued that a genuine issue of material fact remained as to whether the Chiefs' conduct violated R.C. 2744.03(A)(6)(b). Finally, Morrison argued that public official immunity did not apply because it was abolished by statute.

{¶ 30} On December 30, 2020, the trial court, in a well-reasoned order, granted in part and denied in part the defendants' motion for summary judgment.

The trial court granted the motion with respect to the City finding that no exception under R.C. 2744.02(B) applied to remove the cloak of the City's immunity. However, the trial court found that there remained genuine issues of material fact as to whether: 1) the actions of Hamilton, Kaminsky, and Rancourt amounted to reckless misconduct and 2) the actions of the Chiefs amounted to wanton or reckless misconduct. The trial court agreed with Morrison that public official immunity had been abolished and did not apply to the Chiefs.

{¶ 31} The trial court noted in its journal entry that there was no just cause for delay.

{¶ 32} The Emergency Service Employees and the Chiefs appealed and assigned the following sole error for our review.

> The lower court erred by denying summary judgment to Chief Waugh, Chief Haynes, Nicholas Kaminsky, David Rancourt, and Lynnesha Hamilton because they are immune under R.C. Chapter 2744.

{¶ 33} Morrison cross-appealed and assigned the following sole error for our review:

> The Trial Court erred by granting summary judgment to the City of Warrensville Heights on the basis of statutory immunity under R.C. 2744.

## Jurisdiction

{¶ 34} As an initial matter, we must address jurisdiction. Typically, an order denying a motion for summary judgment is not a final, appealable order. *Ceasor v. E. Cleveland,* 2018-Ohio-2741, 112 N.E.3d 496, ¶ 13 (8th Dist.), citing *Hubbell v. Xenia*, 115 Ohio St.3d 77, 2007-Ohio-4839, 873 N.E.2d 878, ¶ 9, citing *State ex rel.*

*Overmeyer v. Walinski*, 8 Ohio St.2d 23, 24, 222 N.E.2d 312 (1966). However, R.C. 2744.02(C) provides:

> An order that denies a political subdivision or an employee of a political subdivision the benefit of an alleged immunity from liability as provided in this chapter or any other provision of the law is a final order.

{¶ 35} As the trial court's decision denying the employees' request for immunity was a final appealable order, our review is appropriate.

{¶ 36} On the other hand, the cross-appeal requires a different analysis. Courts have found that R.C. 2744.02(C) limits our review "to the review of alleged errors in the portion of the trial court's decision that denied the political subdivision [or its employee] the benefit of immunity." *Johnson v. Greater Cleveland Regional Transit Auth.,* 2021-Ohio-938, 171 N.E.3d 422, ¶ 51 (8th Dist.), quoting *Reinhold v. Univ. Hts.*, 8th Dist. Cuyahoga No. 100270, 2014-Ohio-1837, ¶ 21, citing *Riscatti v. Prime Properties Ltd. Partnership*, 137 Ohio St.3d 123, 2013-Ohio-4530, 998 N.E.2d 437, ¶ 20.

{¶ 37} Therefore, in order to review the cross-appeal challenging the trial court's decision granting the City political subdivision immunity, we must determine whether it is a final appealable order. *Cleveland v. Ohio*, 8th Dist. Cuyahoga No. 106688, 2019-Ohio-315, ¶ 12. An order of a court is a final appealable order only if the requirements of both Civ.R. 54(B), if applicable, and R.C. 2505.02 are met. *Id.*, quoting *Philpott v. Ernst & Whinney*, 8th Dist. Cuyahoga No. 61203,

1992 Ohio App. LEXIS 5930, 4 (Nov. 25, 1992), citing *Chef Italiano Corp. v. Kent State Univ.*, 44 Ohio St.3d 86, 541 N.E.2d 64 (1989), syllabus.

{¶ 38} "An order is final if it 'affects a substantial right in an action that in effect determines the action and prevents a judgment.'" *Jaffe v. Cleveland Clinic Found.*, 8th Dist. Cuyahoga No. 110164, 2021-Ohio-3345, ¶ 10, quoting R.C. 2505.02(B)(1). An order that determines the action and prevents judgment "'must dispose of the whole merits of the cause or some separate and distinct branch thereof and leave nothing for the determination of the court.'" *Id.*, citing *Madfan, Inc. v. Makris,* 8th Dist. Cuyahoga No. 102179, 2015-Ohio-1316, at ¶ 6, quoting *Hamilton Cty. Bd. Of Mental Retardation & Dev. Disabilities v. Professionals Guild of Ohio*, 46 Ohio St.3d 147, 153, 545 N.E.2d 1260 (1989).

{¶ 39} In the instant case, the order affects a substantial right, that being potential recovery against the City. *Wisintainer v. Elcen Power Strut Co.*, 67 Ohio St.3d 352, 355, 617 N.E.2d 1136 (1993) (noting that an order affects a substantial right where it affects a plaintiff's ability to recover against an alleged tortfeasor). The trial court order prevents Morrison from recovering on his claims against the City. The fact that Morrison has claims against other defendants, i.e., the Emergency Service Employees and the Chiefs, is irrelevant. *Id.* at 355. Based on the foregoing, we find that the trial court's order was a final order.

{¶ 40} Here, the trial court's journal entry stated, "No just cause for delay," as required for the application of Civ.R. 54(B). By designating a case this way, the

trial court makes a factual determination that "an interlocutory appeal is consistent with the interests of sound judicial administration * * *." *Wisintaiter* at 354.

{¶ 41} The trial court is in the best position to determine whether an immediate appeal will be efficient, preventing the necessity of trying the case twice. *Id.* at 354-355. The trial court's decision to make a Civ.R. 54(B) certification should be affirmed "where the record indicates that the interests of sound judicial administration could be served by a finding of 'no just reason for delay.'" *Id.* at 355. This is such a case. The trial court's entry effectively removes the City as a defendant. As such, it makes little sense to resolve the City employee's appeal now and hold for later a decision on whether the trial court was correct in granting summary judgment to the City. Therefore, it is appropriate to address both issues.

**Standard of Review**

{¶ 42} In their sole assignment of error, the Emergency Service Employees and the Chiefs argue the trial court erred when it denied their motion for summary judgment.

{¶ 43} Preliminarily, our review of summary judgment is de novo. *Johnson v. Cleveland City School Dist.*, 8th Dist. Cuyahoga No. 94214, 2011-Ohio-2778, ¶ 33. In a de novo review, "we afford no deference to the trial court's decision and independently review the record to determine whether [the denial of] summary judgment is appropriate." *Id.* at ¶ 53, citing *Hollins v. Shaffer,* 182 Ohio App.3d 282, 2009-Ohio-2136, 912 N.E.2d 637, ¶ 12 (8th Dist.).

{¶ 44} Summary judgment is appropriate when "(1) no genuine issue as to any material fact exists; (2) the party moving for summary judgment is entitled to judgment as a matter of law; and (3) viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can only reach one conclusion which is adverse to the nonmoving party." *Ceasor* 2018-Ohio-2741 at ¶ 15, citing *Hull v. Sawchyn*, 145 Ohio App.3d 193, 196, 762 N.E.2d 416 (8th Dist.2001).

{¶ 45} "The burden of showing that no genuine issue of material fact exists falls on the party who moves for summary judgment." *Sickles v. Jackson Cty. Hwy. Dept.,* 196 Ohio App.3d 703, 2011-Ohio-6102, 965 N.E.2d 330, ¶ 12 (4th Dist.), citing *Dresher v. Burt,* 75 Ohio St.3d 280, 294, 662 N.E.2d 264 (1996). To meet this burden, the moving party must reference "the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action," that demonstrate the non-moving party has no evidence to support their claims. *Id.*, citing Civ.R. 56(C). Once the moving party has met its burden, the nonmoving party must respond with affidavits and/or set forth specific facts as provided in Civ.R. 56 showing there are genuine issues for trial. *Id.*, citing Civ.R. 56(E).

**Statutory Immunity of Political Subdivision Employees**

{¶ 46} For ease of discussion, we will start with an overview of the protections provided to political subdivision employees under Chapter 2744. Once that review is complete, we will address how those protections apply to the

Emergency Service Employees and the Chiefs separately based on their differing roles in this case.

{¶ 47} Preliminarily, Ohio's Political Subdivision Tort Liability Act, codified in R.C. Chapter 2744, "sets forth a comprehensive statutory scheme for the tort liability of political subdivisions and their employees." *McConnel v. Dudley,* 158 Ohio St.3d 388, 2019-Ohio-4740, 144 N.E.3d 369, ¶ 20, citing *Supportive Solutions, L.L.C. v. Electronic Classroom of Tomorrow*, 137 Ohio St.3d 23, 2013-Ohio-2410, 997 N.E.2d 490, ¶ 11. R.C. 2744.02 governs the immunity of a political subdivision, while R.C. 2744.03(A)(6) governs the immunity of political subdivision employees.

{¶ 48} Our analysis of a political subdivision *employee's* immunity under Chapter 2744 is different than our analysis of the immunity of the political subdivision itself. *Johnson v. Greater Cleveland Regional Transit Auth.,* 2021-Ohio-938, 171 N.E.3d 422, ¶ 98 (8th Dist.). R.C. 2744.02 requires a three-tiered analysis to determine whether a political subdivision is entitled to immunity. *Id.* at ¶ 60. Although we will address the three-tiered analysis in more detail in our discussion of Morrison's cross-appeal below, we briefly note that under tier one, a political subdivision is entitled to immunity for its governmental and proprietary functions, unless, under tier two, one of the exceptions in R.C. 2744.02(B) apply to the facts of the case. Even if one of the exceptions applies, however, under tier three the political subdivision may reclaim immunity if they can establish that a defense to their action applies. *Id.* at ¶ 60-62.

**{¶ 49}** In contrast, R.C. 2744.03(A)(6) provides that an employee of a political subdivision is immune from liability "[i]n a civil action * * * to recover damages for injury, death or loss to person or property allegedly caused by any act or omission in connection with a governmental or proprietary function" unless one of the following applies:

> (a) The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities;

> (b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner; [or]

> (c) Civil liability is expressly imposed upon the employee by a section of the Revised Code.

*Johnson* at ¶ 99.

**{¶ 50}** With the above principles in mind, we address the Emergency Services Employees' contention that the trial court erred when it denied their motion for summary judgment.

## Immunity – Emergency Service Employees:  Hamilton, Kaminsky, and Rancourt

**{¶ 51}** Within the sole assignment of error, the Emergency Service Employees argue that the trial court erred when it found that there was a genuine issue of material fact as to whether the Emergency Service Employees' actions rose to the level of recklessness such that it removed the protection of R.C. 2744.03(A)(6).

**{¶ 52}** As we have previously noted, the Emergency Service Employees are immune from liability unless one of the exceptions listed in R.C. 2744.03(A)(6)(a),

(b), or (c) apply. In the instant case, the trial court found that the exception to immunity contained in R.C. 2744.03(A)(6)(b) applied, depriving them of the protection of immunity. In its ruling, the trial court specifically found that the conduct of the Emergency Service Employees was not wanton, but that there remained genuine issues of material fact as to whether their conduct was reckless.

{¶ 53} We note that the issue of whether conduct is wanton or reckless is usually reserved for the jury. *Miller v. Hace,* 8th Dist. Cuyahoga No. 102500, 2015-Ohio-3591, ¶ 17, quoting *Peer v. Sayers,* 11th Dist. Trumbull No. 2011-T-0014, 2011-Ohio-5439, ¶ 32, citing *Fabrey v. McDonald Village Police Dept.,* 70 Ohio St.3d 351, 356, 639 N.E.2d 31 (1994).

{¶ 54} However, the standard for showing wanton or reckless misconduct is high. *Id.* "'[M]ere negligence is not converted into wanton misconduct unless the evidence establishes a disposition to perversity on the part of the tortfeaser.'" *Fabrey v. McDonald Village Police Dept.,* 70 Ohio St.3d 351, 356, 639 N.E.2d 31 (1971), quoting *Roszman v. Sammett* (1971), 26 Ohio St.2d 94, 96-97, 269 N.E.2d 420, 422. (1971). Further, "'[t]he actor's conduct is in reckless disregard of the safety of others if * * * such risk is substantially greater than that which is necessary to make his conduct negligent." *Id.,* citing *Thompson v. McNeill,* 53 Ohio St.3d 102, 559 N.E.2d 705 (1990), quoting 2 Restatement of the Law 2d, Torts, Section 500, at 587 (1965).

{¶ 55} In the instant case, the trial court found that the actions of Hamilton, Kaminsky, and Rancourt failed to rise to the level of conduct constituting a wanton disregard.

{¶ 56} "Wanton misconduct" is defined as "the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result." *Anderson v. Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711, 983 N.E.2d 266, ¶ 33, citing *Hawkins v. Ivy*, 50 Ohio St.2d 114, 117-118, 363 N.E.2d 367 (1977). (*See also Black's Law Dictionary* 1613-1614 (8th Ed.2004) (explaining that one acting in a wanton manner is aware of the risk of the conduct but is not trying to avoid it and is indifferent to the results). *Id*. The record strongly supports the trial court's determination.

{¶ 57} The record reveals that just prior to Ms. Morrison's call, Kaminsky, Rancourt, Jordan, and Patrick had been dispatched to a smoke alarm. This call was at 9:01 a.m., 36 minutes before Ms. Morrison placed her call to 911. The record reflects the firefighters returned to the fire station by approximately 9:34 a.m., three minutes before Ms. Morrison's call. According to Sheehy's report, Kaminsky and Rancourt would have been in full turn-out gear for the smoke alarm call and would have had to change out of that gear to go to Ms. Morrison's call. And yet, based on the time-stamped recorded call, they were en route to Ms. Morrison's home by 9:40 a.m. While there were issues with address verification during the course of this call, given the totality of the surrounding circumstances, we cannot conclude Kaminsky

and Rancourt lacked care or were indifferent to the results of their actions. As such, their behavior is devoid of wanton disregard.

{¶ 58} We make the same finding with respect to Hamilton. City dispatchers had multiple responsibilities, and it was well known that dispatchers were overwhelmed. The record before us displays that there were occasions where dispatchers were unavailable due to addressing other primary responsibilities. However, there was no evidence in the record that dispatchers perversely disregarded their responsibilities. Moreover, there is no evidence in this record that Hamilton perversely disregarded her duties with respect to Ms. Morrison's call.

{¶ 59} Based on the foregoing, the actions of the employees did not rise to the level of wanton misconduct removing the protection of immunity. Therefore, the trial court was correct in finding there was no wanton misconduct.

{¶ 60} Since immunity may be removed if the employees' conduct is wanton or reckless, we now address whether the trial court erred in finding that the Emergency Service Employees' conduct rose to the level of recklessness. "Reckless conduct" is defined as the "conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Anderson v. Massillon*, 2012-Ohio-5711 at ¶ 34, citing *Thompson v. McNeill*, 53 Ohio St.3d 102, 104-105, 559 N.E.2d 705 (1990), adopting 2 Restatement of the Law 2d, Torts, Section 500, at 587 (1965).

{¶ 61} We conclude the trial court correctly found that there remained a genuine issue of material fact as to whether the Emergency Service Employees'

conduct was reckless. It was well known in the City that the emergency services department had antiquated equipment, and as such, the importance of relaying and notating accurate information was obvious. Errors due to failure to verify addresses were a known issue. It was also well known that dispatchers, due to other duties, would not always be available on the radio. Firefighters were aware that they could not count on dispatch to be available during the course of a call, to verify addresses, or to hear other pertinent information. And further still, firefighters were aware of simple address verification techniques used by other departments that were not utilized by the City. For instance, Kaminsky testified about haloing, the simple act of repeating the address to verify it was heard correctly. Kaminsky testified that the City did not use the haloing technique. Furthermore, none of the Emergency Service Employees utilized haloing during the course of this incident.

{¶ 62} Finally, Morrison has pointed to the official reports in this matter and argues that the Emergency Service Employees deliberately falsified the times in those documents to hide the fact that Ms. Morrison's treatment was delayed by a mistaken address. The Emergency Service Employees argue that reports created after the fact are irrelevant to the determination of whether their conduct was reckless. We disagree. In this case, there are two relevant reports, the run report, created by Rancourt and a dispatch call log created by Hamilton. Both the run report and the dispatch report show that Ms. Morrison's 911 call was received at 9:40 a.m. However, the 911 call was actually received at 9:37 a.m. This change makes it appear that EMS was dispatched as soon as the call was received. They both also

show that EMS arrived at Ms. Morrison's home at 9:44 a.m. making it appear that Ms. Morrison received services three minutes earlier than she actually did.

{¶ 63} A reasonable interpretation of the information in these reports when looked at in a light most favorable to Morrison is that the reports deliberately concealed Ms. Morrison's delayed treatment. It is also reasonable to infer the reports demonstrated that Hamilton and Rancourt were aware that the delay in treatment may have contributed to Ms. Morrison's death.

{¶ 64} Based on all of the circumstances, we conclude that a genuine issue of material fact remained as to whether given their knowledge of the deficiencies Hamilton, Kaminsky, and Rancourt acted recklessly. As such, the trial court did not err when it denied the motion for summary judgment as to the Emergency Service Employees.

**Immunity – Chiefs – Chief Haynes and Chief Waugh**

{¶ 65} The trial court found that a genuine issue of material fact remained as to whether Chief Haynes' and Chief Waugh's conduct was wanton and/or reckless therefore breaching their immunity.

{¶ 66} The Chiefs argue they are entitled to public official immunity as well as employee immunity under R.C. 2744.03(A)(6). The trial court rejected this claim finding that "the statutory scheme of R.C. 2744 does not reserve common law public official immunity for police chief and fire chiefs." We agree. (*See Friga v. E. Cleveland*, 8th Dist. Cuyahoga No. 88262, 2007-Ohio-1716, ¶ 11, finding that R.C. 2744.02(A)(1) confers statutory immunity to political subdivisions and

preserves common-law immunity only for "an employee who is a county prosecuting attorney, city director of law, village solicitor, or similar chief legal officer of a political subdivision, an assistant to such person, or a judge of a court of this state * * *. R.C. 2744.03(A)(7)."). Since the Chiefs' positions are not within the specified employees who are preserved common-law immunity, they cannot claim this immunity.

{¶ 67} The Chiefs argue in the alternative that the trial court erred in finding that there remained a genuine issue of material fact as to whether their conduct rose to the level of wanton and/or reckless disregard under R.C. 2744.03(A)(6)(b). The Chiefs claim they were not directly involved in Ms. Morrison's care; thus Morrison never established a special relationship between them and Ms. Morrison. They argue that if there was no relationship there was no duty of care owed to Ms. Morrison. Thus, they claim Morrison cannot establish that they owed a duty of care to Ms. Morrison. Neither can Morrison show that their failure to enact policies and procedures was the proximate cause of Ms. Morrison's death.

{¶ 68} We have addressed the issue of duty as it applies to cases involving immunity before in *Moore v. Cleveland*, 2017-Ohio-1156, 87 N.E.3d 858 (8th Dist.). In *Moore*, the appellant appealed a ruling of the trial court granting summary judgment to the appellees, police officers, finding the police officers were entitled to immunity under R.C. 2744.03(A)(6). The officers argued that the existence of a legal duty must be established using conventional tort principles. *Id.* at ¶ 17-18, citing *Estate of Graves v. Circleville*, 124 Ohio St.3d 339, 2010-Ohio-168, 922 N.E.2d 201,

¶ 25 and *Wallace v. Ohio Dept. of Commerce*, 96 Ohio St.3d 266, 2002-Ohio-4210, 773 N.E.2d 1018.

{¶ 69} Noting that "[a]lthough duty is an element of a tort claim, the law is silent as to the relation of 'duty' to the immunity analysis," the court found "[w]hen a plaintiff files a civil action against an employee of a political subdivision, the employee's entitlement to statutory immunity is a separate question from the plaintiff's ability to establish the elements of his or her claim." *Id.* at ¶ 23, citing *Argabrite v. Neer*, 149 Ohio St.3d 349, 2016-Ohio-8374, 75 N.E.3d 161, ¶ 8, 15. In other words, we must determine whether the Chiefs are entitled to immunity, not whether Morrison can ultimately prove his claim. As the Supreme Court noted in *Argabrite*, "if the officers had acted recklessly, they would not be entitled to immunity, but they could still avoid liability by establishing that their reckless actions were not the proximate cause of Argabrite's injuries." *Id.* at ¶ 10.

{¶ 70} Accordingly, the Chiefs' claim that Morrison will not be able to prove that their conduct was a proximate cause of Ms. Morrison's injuries is beyond the scope of our review. If the Chiefs' conduct removes immunity pursuant to R.C. 2744.03(A)(6)(b), the issue of proximate cause is a question for the trier of fact.

{¶ 71} Nevertheless, we must still address the issue of "duty." As we have discussed previously, duty is an element to both wanton misconduct and reckless misconduct. The Chiefs claim, citing to *Bush v. Cty. of Ashland*, 5th Dist. Ashland No. 09-CA-25, 2010-Ohio-1732 and *Clemets v. Heston*, 20 Ohio App.3d 132, 485 N.E.2d 287 (6th Dist.1985), that there must be a special relationship between the

Chiefs and Ms. Morrison, in order for there to be an actionable duty. However, *Bush* is distinguishable from the case at hand, because it involved a cause of action for failure of police to exercise control over a third party who later committed a criminal act. *Clemets* is also distinguishable. In *Clemets*, a case involving a decedent who committed suicide after being arrested and released for operating a vehicle while intoxicated, the court dealt with the duty created by statute when police arrest and subsequently release someone. That is not the situation here.

{¶ 72} While neither *Bush* nor *Clemets* apply to the facts of this case, we still must determine whether the Chiefs owed a duty to Ms. Morrison under immunity analysis. The Supreme Court has not, as yet, addressed the concept of duty in political subdivision immunity cases. *Moore*, 2017-Ohio-1156 at ¶ 23. The trial court elected to examine duty by looking at the traditional definition of the term. Absent direction from the Supreme Court or the legislature to the contrary, we agree with the trial court that our analysis of duty starts from the traditional concept:

> "Duty, as used in Ohio tort law, refers to the relationship between the plaintiff and the defendant from which arises an obligation on the part of the defendant to exercise due care toward the plaintiff." *Commerce & Industry Ins. Co.* [*v. Toledo*], 45 Ohio St.3d [96,] 98, 543 N.E.2d 1188 [(1989)]; *see*, also, *Huston v. Konieczny*, 52 Ohio St.3d 214, 217, 556 N.E.2d 505 (1990). This court has often stated that the existence of a duty depends upon the foreseeability of harm: if a reasonably prudent person would have anticipated that an injury was likely to result from a particular act, the court could find that the duty element of negligence is satisfied. *Texler v. D.O. Summers Cleaners & Shirt Laundry Co.*, 81 Ohio St.3d 677, 680, 693 N.E.2d 271 (1998); *Commerce & Industry*, 45 Ohio St.3d 96, 98, 543 N.E.2d 1188 (1989); *Menifee v. Ohio Welding Products, Inc.*, 15 Ohio St.3d 75, 77, 472 N.E.2d 707 (1984). In addition, we have also stated that the duty element of negligence may be established by common law, by legislative enactment, or by the

particular circumstances of a given case. *Chambers v. St. Mary's School,* 82 Ohio St.3d 563, 565, 697 N.E.2d 198 (1998); *Eisenhuth v. Moneyhon*, 161 Ohio St. 367, 119 N.E.2d 440 (1954), paragraph one of the syllabus. Admittedly, however, the concept of duty in negligence law is at times an elusive one.

*Moore* at ¶ 18, quoting *Wallace v. Ohio Dept. of Commerce*, 96 Ohio St.3d 266, 2002-Ohio-4210, 773 N.E.2d 1018 at ¶ 23.

{¶ 73} In the instant case, we find that a reasonably prudent person would have anticipated that harm to Morrison was likely to occur if proper address verification procedures were not implemented. Verification of information, which is relied upon for life and death decisions, is critical to avoid human error. The dispatch department was understaffed, overworked, and overwhelmed. It was generally known and had been reported to the Chiefs that dispatchers were often called away from the radio to perform other duties. Further, it was generally known that emergency services had gone to the incorrect address multiple times and that issue had been raised with the Chiefs. Despite this knowledge, the Chiefs had not taken sufficient steps to address these issues, nor had they created policies and procedures for the provision of emergency services. It was foreseeable that these lapses would lead to delayed treatment causing severe injury and/or death.

{¶ 74} Given the foregoing, the potential harm caused by a delay of treatment to Ms. Morrison was foreseeable. Therefore, the Chiefs did owe a duty of due care to Ms. Morrison. In order to breach immunity, however, we must determine whether the Chiefs conduct was wanton and/or reckless. As we have noted, "wanton misconduct" is a "failure to exercise any care toward those to whom

a duty of care is owed in circumstances in which there is great probability that harm will result." *Anderson v. Massillon*, 2012-Ohio-5711 at ¶ 33, citing *Hawkins v. Ivy* 50 Ohio St.2d 114, 117-118, 363 N.E.2d 367 (1977). In the instant case, the Chiefs' failure to institute changes when faced with known issues that posed a serious risk of harm to those to whom they owed a duty of care, raises a genuine issue of material fact as to whether their conduct was wanton misconduct.

{¶ 75} The determination of whether there remains a genuine issue of material fact as to whether the Chiefs' conduct was reckless must be made. "Reckless conduct" is the "conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Id.* at ¶ 34. The record supports a conclusion that there remained genuine issues of material fact as to whether the Chiefs' conduct was reckless. Reasonable minds could disagree on whether the Chiefs' knowledge of the problems in the dispatch department, knowledge of mistaken address, and the failure to take simple steps to address these issues amounted to a conscious disregard of or indifference to a known or obvious risk of harm. *See Plush v. Cincinnati*, 2020-Ohio-6713, 164 N.E.3d 1056, ¶ 40 (1st Dist.) (although the case involves a Civ.R. 12(b)(6) motion to dismiss and not a summary judgment, its analysis regarding immunity is relevant here where the court found that the city manager's awareness of and failure to address understaffing, training, and technology malfunctions demonstrated reckless misconduct).

{¶ 76} Based on the foregoing, the trial court properly denied the defendants' motion for summary judgment as it relates to the Chiefs.

{¶ 77} Accordingly, we overrule the Emergency Service Employees' and the Chiefs' assignment of error.

**Cross-Appeal by Morrison – Immunity of the City**

{¶ 78} We now turn to Morrison's cross-appeal of the trial court's decision granting immunity to the City. As we discussed briefly before, there is a three-tiered analysis to determine whether a political subdivision is immune from liability under R.C. 2744.02. *Rankin v. Cuyahoga Cty. Dept. of Children & Family Servs.*, 118 Ohio St.3d 392, 2008-Ohio-2567, 889 N.E.2d 521, ¶ 8, quoting *Cater v. Cleveland* (1998), 83 Ohio St.3d 24, 28, 697 N.E.2d 610 (1998).

{¶ 79} R.C. 2744.02(A)(1) divides the functions of a political subdivision into two types, governmental functions and proprietary functions. Under the first tier, if a defendant is determined to be a political subdivision, it is immune from liability for its governmental and proprietary functions "in a civil action for injury, death, or loss to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision * * *."

{¶ 80} Under the second tier, the immunity conferred under R.C. 2744.02(A)(1) "is not absolute, but is * * * subject to the five exceptions to immunity listed in * * * R.C. 2744.02(B)." *Hortman v. Miamisburg,* 110 Ohio St.3d 194, 2006- Ohio-4251, 852 N.E.2d 716, ¶ 12, quoting *Cater*, 83 Ohio St.3d at 28, 697 N.E.2d 610 (1998).

{¶ 81} The third tier of political subdivision immunity analysis comes into operation if it is determined that one of the exceptions to immunity under R.C. 2744.02(B)(1) through (5) applies. Under the third tier, immunity can be reinstated if the political subdivision can demonstrate that one of the defenses under R.C. 2744.03 applies. *Id.*

{¶ 82} Under the first tier of the analysis, the City qualifies as a political subdivision. R.C. 2744.01(F). The next question is whether the City was engaged in a governmental or proprietary function during the incident that caused the claimed loss. R.C. 2744.01(C)(2)(a) indicates that the "provision or nonprovision of police, fire, emergency medical, ambulance, and rescue services or protection" is a "governmental function." Therefore, the City is entitled to immunity from suit unless Morrison can establish under the second tier that one of the exceptions to immunity applies.

{¶ 83} Morrison claims that R.C. 2744.02(B)(5) applies in that a statute exists that expressly imposes civil liability upon the City for its conduct in Ms. Morrison's death. Specifically, Morrison cites R.C. 4765.49(B) as imposing liability on the City in this case. R.C. 4765.49(B) provides:

> A political subdivision * * * and any officer or employee * * * that provides emergency medical services * * * is not liable in damages in a civil action for injury, death, or loss to person or property arising out of any actions taken by a first responder * * * unless the services are provided in a manner that constitutes willful or wanton misconduct.

{¶ 84} Morrison argues that Kaminsky and Rancourt acted with wanton disregard towards Ms. Morrison, by failing to use basic address verification

procedures in response to her 911 call. Morrison concludes that this behavior amounts to willful and wanton conduct under R.C. 4765.49(B), and therefore, expressly makes the City liable for damages under R.C. 2744.02(B)(5). We disagree.

{¶ 85} As we have already discussed, the record supports the trial court's finding that Kaminsky's and Rancourt's behavior did not rise to the level of wanton misconduct. Similarly, we find that their behavior did not rise to the level of willful misconduct either. The Supreme Court has found that willful misconduct

> implies an intentional deviation from a clear duty or from a definite rule of conduct, a deliberate purpose not to discharge some duty necessary to safety, or purposefully doing wrongful acts with knowledge or appreciation of the likelihood of resulting injury. *Tighe v. Diamond*, 149 Ohio St. at 520, 80 N.E.2d 122 (1948); *see also Black's Law Dictionary* 1630 (8th Ed.2004) (describing willful conduct as the voluntary or intentional violation or disregard of a known legal duty).

*Anderson v. Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711, 983 N.E.2d 266, ¶ 32.

{¶ 86} Given our review of the facts, there is no evidence that Kaminsky's and Rancourt's behavior was an intentional deviation from a clear duty or definite rule of conduct.

{¶ 87} We agree with the trial court that Kaminsky and Rancourt did not act with wanton or willful disregard. Consequently, the City is entitled to political subdivision immunity.

{¶ 88} Accordingly, Morrison's cross-assignment of error is overruled.

{¶ 89} In summary, under the employees' assignment of error, Morrison established that there remained genuine issues of material fact as to whether the conduct of the Emergency Services Employees was reckless. Further, he established

that there remained genuine issues of material fact as to whether the Chiefs' conduct was wanton and/or reckless. Accordingly, the trial court correctly denied them summary judgment based on political subdivision employee immunity. Under Morrison's cross-assignment of error, the City successfully established that there were no remaining genuine issues of material fact. The conduct of Kaminsky and Rancourt was neither willful nor wanton. Therefore, the City is entitled to immunity under R.C. 2744.02.

{¶ 90} Judgment affirmed.

It is ordered that appellants/cross-appellees and appellee/cross-appellant share the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EMANUELLA D. GROVES, JUDGE

SEAN C. GALLAGHER, A.J., and
FRANK DANIEL CELEBREZZE, III, J., CONCUR