[Cite as *Forsythe Fin., L.L.C. v. Yothment*, 2022-Ohio-2798.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| FORSYTHE FINANCE, LLC, | : | APPEAL NO. C-210606<br>TRIAL NO. 21CV-08067 |
| Plaintiff, | : | |
| vs. | : | |
| JAMES YOTHMENT, | : | |
| Defendant/Third-Party Plaintiff-Appellant, | : | |
| | : | |
| vs. | | |
| NCP FINANCE OHIO, LLC, | : | |
| and | : | |
| SUNUP FINANCIAL, LLC, | : | |
| Third-Party Defendants-Appellees. | : | |

---

| | | |
|---|---|---|
| FORSYTHE FINANCE, LLC, | : | APPEAL NO. C-210550<br>TRIAL NO. 21CV-07061 |
| Plaintiff, | : | |
| vs. | : | |
| CATHLEEN SPELLMAN, | : | |
| Defendant/Third-Party Plaintiff-Appellant, | : | |
| | : | |
| vs. | | |
| NCP FINANCE OHIO, LLC, | : | |
| and | : | |
| SUNUP FINANCIAL, LLC, | : | |

Third-Party Defendants-
Appellees.                              :

---

FORSYTHE FINANCE, LLC,          :        APPEAL NO. C-210626
                                         TRIAL NO. 21CV-05720
    Plaintiff,                   :
                                            *O P I N I O N.*
  vs.                            :

RICHARD SEIBERT,                 :

    Defendant/Third-Party Plaintiff-   :
    Appellant,
                                 :
  vs.

BASTION FUNDING OH I, LLC,       :

    and                          :

SUNUP FINANCIAL, LLC,            :

    Third-Party Defendants-      :
    Appellees.


Civil Appeals From:  Hamilton County Municipal Court

Judgments Appealed From Are:  Reversed and Cause Remanded

Date of Judgment Entry on Appeal: August 12, 2022


*McKinney & Namei Co.,* and *John A. Rebel,* for Defendants/Third-Party Plaintiffs-
Appellants,

*Taft Stettinius & Hollister LLP, Michael L. Meyer, Philip D. Williamson* and *William E. Braff*, for Third-Party Defendants-Appellees.

**BERGERON, Judge.**

{¶1} In this collection of appeals, consolidated for opinion purposes, borrowers-appellants contend that each trial court below erred in granting motions to dismiss for failure to state a claim, dismissing their third-party complaints that challenged the legitimacy of certain loans issued to them. Given the allegations in the third-party complaints and the contracts attached thereto, we find that the borrowers satisfied the minimal requirements necessary to survive dismissal. We accordingly sustain the assignments of error and remand the cause to the trial courts for further proceedings consistent with this opinion.

I.

{¶2} Some lenders explore creative ways to try to charge excessive interest rates, often in a cat and mouse game with the legislature that endeavors to proscribe such efforts. These cases involved such an example, with a lender—prohibited from making certain loans directly—partnering with a third party to provide loans that require Ohio individuals to repay three times what they borrowed.

{¶3} Before launching into the facts at hand, we provide some context on the regulatory framework at play here. The version of the Ohio Mortgage Loan Act ("MLA") governing the transactions at issue required mortgage lenders and brokers to register with Ohio's Division of Financial Institutions ("DFI") before making certain loans. In exchange for becoming a registrant, lenders received the ability to conduct activities connected with residential mortgage loans other than first-lien loans. Registrants could advertise, solicit, and hold out that they were validly engaged in the business of providing residential mortgage loans. They could collect mortgage payments for themselves and on behalf of others. They could employ and compensate mortgage loan originators. And in the quirk directly implicating this case, they could

offer unsecured loans (or loans secured by something other than real property) with unlimited interest rates, provided the loan amounts fell below $5,000.

{¶4} NCP Finance Ohio ("NCP") is one such registrant. Founded in 2005, NCP is a consumer finance company which offers credit solutions to "alternative" lending companies and individual consumers. NCP provides only short-term loans, admonishing consumers on its website that there are less costly ways to manage their immediate need for cash. Borrowers who fear they cannot pay on time are advised that longer-term products through traditional banks could offer a better option. Because mortgages are not short-term loans, one might be puzzled as to why NCP registered under Ohio's MLA. Keep reading.

{¶5} In 2008, the General Assembly passed what was at the time the strongest payday lending reform bill in the country. The Ohio Short-Term Loan Act ("STLA") capped the interest rate of short-term loans at 28 percent (inclusive of all fees), limited the maximum loan amount to $500, and limited borrowers to four loans a year. *See* former R.C. 1321.39 to 1321.48. Like the MLA, it forced lenders to register with the DFI before engaging in the business of making short-term loans to borrowers. "And then a funny thing happened: nothing. It was as if the STLA did not exist. Not a single lender in Ohio is subject to the law. How is this possible? How can the General Assembly set out to regulate a controversial industry and achieve absolutely nothing? Were the lobbyists smarter than the legislators? Did the legislators realize that the bill was smoke and mirrors and would accomplish nothing?" *Ohio Neighborhood Fin., Inc. v. Scott*, 139 Ohio St.3d 536, 2014-Ohio-2440, 13 N.E.3d 1115, ¶ 43 (Pfeifer, J., concurring).

4

{¶6} The answer to Justice Pfeifer's question is that lenders such as NCP registered under the MLA, presumably to circumvent the STLA's restrictions. And while the MLA allowed unfettered interest and fees to be charged for loans under $5,000, there was still the pesky provision in former R.C. 1321.52(C) subjecting MLA registrants making unsecured loans to all the rules prescribed under sections R.C. 1321.51 to 1321.60. Two of those rules capped the interest rate that a registrant could contract for and receive at 21 percent of the unpaid principal balance of the loan, or any rate agreed on by the parties so long as it did not exceed 25 percent. *See* former R.C. 1321.57 and 1321.571. This meant that a lender registering under the MLA could bypass the STLA's maximum loan amount of $500, but it could not charge an interest rate exceeding 25 percent. What to do in such a circumstance?

{¶7} Enter SunUp, a credit services organization ("CSO") governed by the Ohio Credit Services Organization Act ("CSOA"). The CSOA is (ostensibly) a consumer-protection law promoted on the Ohio Attorney General's website as one of the "key protections that consumers have under the law." The CSOA regulates organizations that provide credit-repair assistance, debt counseling, and other debt-related services to consumers. Like the MLA (and supposedly the STLA), CSOs must register before conducting business in Ohio. In exchange, the CSO can advertise its services and charge consumers a fee for providing debt-related services. But unlike the MLA and the STLA, the version of the CSOA applicable here placed no restrictions on the fees charged by CSOs. And because CSOs can obtain extensions of credit for a borrower by law, the fees assessed by a CSO acting in a loan-broker capacity were essentially unregulated. Perhaps you can see where this is going.

{¶8}   The CSOA specifically excludes organizations that make or collect loans and licensed mortgage brokers.  By law then, MLA registrants cannot be CSOs, and CSOs cannot be MLA registrants.  Under what certain lenders dubbed the "CSO model," the setup goes like this: the lender (NCP) registers under the MLA so that it can advertise and collect on the loan.  But because that opens it up to interest limitations they prefer to avoid, the MLA registrant partners with a CSO (SunUp) to "assist" the consumer in obtaining the loan.  The MLA registrant can only charge 25 percent interest on its portion of the loan.  The CSO, however, can and does charge fees far exceeding 25 percent interest.  A loan that would be otherwise impermissible for NCP to make under Ohio law was then (theoretically, at least) possible simply through its association with SunUp.  Left unexplored is the degree to which the registrants and the brokers are working in concert, obfuscating the line between lawful and not.  As we will see, the General Assembly subsequently promulgated provisions designed to outlaw this exact practice.

II.

{¶9}   With that background in mind, we shift the focus to the facts at hand. SunUp brokered the loans between the borrowers and the lenders in this case. Borrowers who accept a loan facilitated by SunUp enter first into a credit services agreement ("CSA") and are charged a CSO fee, payable to SunUp.  The CSA provides that the fee is due on the same day the loan is made.  It further gives borrowers the option of paying the fee directly to SunUp or of having it financed by a third-party lender (more on this in a bit).  In each of the consolidated cases before us on appeal, the CSO fee charged by SunUp exceeded the requested loan amount by nearly 200

percent. Unsurprisingly, all the borrowers elected to have the CSO fee financed with the loan.

{¶10} As part of this process, the borrowers also executed a promissory note with the third-party lender that SunUp arranged to fund the loan. From the total loan proceeds, each lender then distributed the requested loan amount to the borrower and paid the remainder to SunUp "on behalf" of the borrower, resulting in each borrower owing approximately three times more than the amount they received. For example, Cathleen Spellman financed a total amount of $5,013.38 with NCP. The promissory note between Ms. Spellman and NCP indicates that NCP disbursed $1,750 directly to Ms. Spellman and sent $3,263.38 to SunUp on behalf of Ms. Spellman to cover the CSO fee. But Ms. Spellman would make all of her payments to NCP. Likewise, James Yothment financed a total of $7,363.70 through NCP, with $2,700 going to Mr. Yothment and the other $4,663.70 sent to SunUp on his behalf. Richard Seibert's loan originated with the now-defunct registrant Bastion Funding OH I LLC, in the total amount of $5,916.63 ($2,000 went to Mr. Seibert and the remaining $3,916.63 to SunUp).

{¶11} All three borrowers defaulted on their loans, prompting the current assignee of the debts, Forsythe Finance, to sue for nonpayment. In response, each borrower filed a third-party complaint against SunUp as the CSO, and NCP or Bastion as the lender. Ms. Spellman's and Mr. Yothment's nearly identical third-party complaints presented four causes of action that alleged violations of the Ohio Second Mortgage Act (a.k.a. the Ohio Mortgage Loan Act), the Ohio Credit Services Act, the Consumer Sales Practices Act, and breach of contract. The third-party complaints invoked the protection of the MLA by contending that the CSO fee is "the addends of

7

the principal amount," thus imposing on Ms. Spellman an obligation to repay a principal amount of $5,013.38 plus 25 percent interest to NCP, and on Mr. Yothment an obligation to repay a principal amount of $7,363.70 plus 25 percent interest to NCP. The third-party complaints also presented arguments that the CSO fee is an unauthorized loan-guaranty fee, an unauthorized broker's fee, or excessive interest.

{¶12} Mr. Seibert's third-party complaint alleged violations of the Ohio MLA, the Ohio CSOA, and R.C. 1343.01. His allegations are in similar vein, stating variously that the MLA applied because the promissory notes imposed an obligation to "pay the principal amount of $5,916.63 to Bastion," that the CSO fee could be considered excessive interest, or that it could be another type of charge unauthorized by law. Alternatively, Mr. Seibert alleged that "in the event that the MLA does not apply because the loan is for $5,000 or less," then Bastion violated R.C. 1343.01, Ohio's usury statute which sets the maximum interest rate for promissory notes.[1]

{¶13} The third-party defendants (just NCP and SunUp at this point) moved to dismiss all the third-party complaints for failure to state a claim under Civ.R. 12(B)(6) or, in the alternative, to compel arbitration. Two primary defenses were raised by NCP and SunUp in the motions to dismiss: first, that the MLA in effect at the time of these loans did not apply because the loan amount did not exceed $5,000, and second, that even if the MLA did apply, SunUp is not subject to the MLA and therefore its actions do not violate the MLA. None of the trial courts addressed NCP and SunUp's request for arbitration.[2] The trial courts dismissed the third-party

---

[1] Bastion is not an appellee to this appeal, and we thus decline to address the usury argument put forth solely against Bastion.

[2] Before each trial court, NCP and SunUp asked that this matter be sent to arbitration should the trial courts decline to grant their motion to dismiss. Now apparently content to litigate the matter, they dropped this argument on appeal and abandoned the point.

complaints "for the reasons stated in the Third Party Defendants' Combined Motion to Dismiss."

**{¶14}** We consolidated the borrowers' appeals into the case number assigned to Ms. Spellman's appeal, and therefore use her name and facts in this opinion for ease of discussion (and because the facts alleged with respect to the other borrowers are substantially similar). We take no position on how the CSO fee should ultimately be classified and note only that the question remains unresolved on the state of this record. The borrowers' third-party complaints and attached contracts all set forth facts that, even if somewhat inartfully pled, render dismissal premature at this stage. Because there is a set of facts here " 'consistent with the plaintiff's complaint, which would allow the plaintiff to recover, the court may not grant [the] defendant's motion to dismiss.' " *City of Cincinnati ex rel. Radford v. City of Cincinnati,* 1st Dist. Hamilton No. C-030749, 2004-Ohio-3501, ¶ 2, quoting *York v. Ohio State Hwy. Patrol,* 60 Ohio St.3d 143, 145, 573 N.E.2d 1063 (1991). Accordingly, we sustain the borrower's sole assignment of error (in each case) and reverse the judgments for the reasons explained more fully below.

III.

**{¶15}** Motions to dismiss should only be granted in situations where "the complaint, when construed in the light most favorable to the plaintiff and presuming all the factual allegations in the complaint are true, demonstrates that the plaintiff can prove no set of facts entitling him to relief." *State ex rel. Belle Tire Distribs. v. Indus. Comm. of Ohio,* 154 Ohio St.3d 488, 2018-Ohio-2122, 116 N.E.3d 102, ¶ 17. When deciding a Civ.R. 12(B)(6) motion to dismiss for failure to state a claim, the trial court "must accept all factual allegations in the complaint as true and draw all reasonable

inferences in favor of the nonmoving party." *Fox Consulting Group, Inc. v. Mailing Servs. of Pittsburgh, Inc.*, 1st Dist. Hamilton No. C-210250, 2022-Ohio-1215, ¶ 6. Appellate courts review a trial court's ruling on a Civ.R. 12(B)(6) motion de novo. *Id.* at ¶ 7. The borrowers need not prove their case at this stage of the adjudication process; rather, they need only plead a set of facts that, if proved, would entitle them to recover. *See id.* at ¶ 7. Because the third-party complaints meet this liberal pleading standard, dismissal is inappropriate at this stage of the pleadings.

A.

**{¶16}** The thrust of NCP and SunUp's first defense is that the CSO fee is independent of the loan issued by NCP, thus rendering the MLA inapplicable. That conclusion strikes us as inconsistent with the framework of the loan and in conflict with many of the key factual points alleged in the third-party complaints. NCP claims that the borrower never pays the CSO fee to a registrant and that SunUp is the only party who charged or received fees relating to the CSO fee. But that premise requires us to construe the facts in NCP and SunUp's favor, rather than the borrower's favor. Take a look at the promissory note at issue, in which the borrower promises to pay NCP the principal amount plus interest, where the principal amount includes the CSO fee. No mention is made of payments going directly from the borrower to the CSO because that's not how the note is structured. NCP's efforts to render itself irrelevant for purposes of analyzing the CSO fee simply cannot be squared with the structure of the contract it prepared.

**{¶17}** The crux of this case turns legally on how the CSO fee should be classified, and factually on the murky (as far the record discloses) relationship between NCP and SunUp. We see at least three potential answers to the classification question

according to Ms. Spellman, all of which come with varying legal implications. Regarding potential violations of the MLA, the CSO fee could be considered principal pursuant to former R.C. 1321.51(D), or it could be interest under former R.C. 1321.51(E), but if it is neither principal nor interest, then it may constitute a prohibited charge under former R.C. 1321.57(H)(1). Ms. Spellman first posits that the CSO fee represents a part of the principal amount of her loan. "Principal" is defined in former R.C. 1321.51(D) as "the amount of cash paid to, or paid or payable for the account of, the borrower, and includes any charge, fee or expense that is financed by the borrower at origination of the loan or during the term of the loan."

{¶18} Characterizing the CSO fee as part of the principal amount certainly seems plausible based on the facts set forth in Ms. Spellman's third-party complaint. Neither side seems to dispute that the CSO fee was (1) a charge, fee, or expense, (2) financed by Ms. Spellman (the borrower), or (3) at the origination of her loan, thus her complaint seems to pass muster in meeting the statutory definition of "principal." Most tellingly, NCP and SunUp's combined motions to dismiss each include a characterization that "[t]he principal amount also included a Credit Services Organization (CSO) fee * * * for SunUp's services as outlined in the Credit Services Agreement." If we proceed from the premise that the CSO fee is principal, which seems plausible based on the face of Ms. Spellman's third-party complaint, the MLA would govern the transaction with respect to the contract between Ms. Spellman and NCP.

{¶19} NCP and SunUp rely on their broad argument that the MLA is inapplicable to these transactions because the version of the MLA in effect at the time only governed loans exceeding $5,000. But the promissory note provides that it is

11

"governed by the laws of the State of Ohio, *specifically the Ohio Mortgage Loan Act.*" (Emphasis added.) That makes sense considering the total amounts of these loans (including the financed CSO fee) did exceed $5,000. The promissory note in Ms. Spellman's case further provides that the principal amount is $5,013.38 and that "[i]nterest will accrue on a daily basis on the unpaid Principal Amount." Our back-of-the-napkin math based on the lending disclosures between Ms. Spellman and NCP indicates that NCP did indeed charge the statutorily allowable maximum interest rate of 25 percent on the *total* amount of $5,013.38. We are perplexed to understand how NCP justifies charging interest on a financial transaction to which it simultaneously claims to not be involved. In other words, more information is needed surrounding this arrangement. Accepting all of Ms. Spellman's factual allegations as true, as we must at this stage, it appears she could prove a set of facts that would demonstrate that the CSO fee represents principal under the MLA. *See Thomas v. Othman*, 2017-Ohio-8449, 99 N.E.3d 1189, ¶ 18 (1st Dist.).

{¶20} The borrowers alternatively contend that if the CSO fee is not principal, then it constitutes a form of interest exceeding the permissible maximum rate allowed by the MLA. "Interest" is defined in former R.C. 1321.51(E) as "all charges payable *directly or indirectly* by a borrower to a registrant as a condition to a loan or an application for a loan." (Emphasis added.) Here again, NCP and SunUp dispute the applicability of the MLA in its entirety, pointing to the distinctions between registrants under the MLA (such as NCP) and nonregistrants (such as SunUp). They argue that "because borrowers never pay the CSO fee to a registrant lender, the CSO fee cannot be interest under the MLA." Simply parsed, they refute the notion that the MLA

applies or that the CSO fee could be interest because the fee is paid to SunUp, a nonregistrant, and not to NCP, a registrant.

{¶21} Accepting NCP and SunUp's argument on this point requires starting from the premise that the CSO fee is paid solely by the borrower to SunUp, a fact not yet established on this record. It also requires ignoring the plain text of the statutory definition of "interest." NCP freely admits to transferring the CSO fee directly to SunUp on behalf of the borrower and to receiving payments from the borrowers, but despite that admission, it proclaims that the CSO fee is not charged by NCP or payable to NCP. Again, we cannot reach such a conclusion without construing the facts in favor of NCP and SunUp. The statute defines interest as all charges payable directly or indirectly to a registrant as a condition of the loan. The promissory note charged Ms. Spellman with paying *NCP* back the full amount of $5,013.38, not SunUp, a potentially indirect way for the CSO fee to be paid by Ms. Spellman to NCP. Whether one views this as direct or indirect, the money appears to go in NCP's pocket, at least for statutory purposes. Furthermore, as noted above, it appears NCP charged interest on the CSO fee. We struggle to reconcile how NCP could front the funds to SunUp, facilitate the transfer, collect reimbursement (including interest) from the borrower, and then wash its hands of any involvement with the CSO fee. Especially on this record, which has yet to shed light on the relationship between NCP and SunUp.

{¶22} Another consequence of NCP and SunUp's argument here is that, if correct, SunUp had no constraint on its ability to charge its fee. If it wanted, it could have charged $10,000, or even $1,000,000. SunUp admits that the legislative loophole could allow for such mind-boggling charges but is quick to claim that such amounts would be fanciful because no borrower would agree to it. This argument,

however, strays out onto thin ice. After all, the borrowers here agreed to pay twice the amount of their loans. Maybe they would have refused our million-dollar example, but if they were truly desperate, why not three or four times the loan amount? This illustrates the problems inherent in this arrangement because the General Assembly sought to protect consumers, but SunUp is effectively saying that it can charge any fee amount without constraint.

{¶23} This concerning arrangement between the third-party defendants also raises serious questions about whether the CSO fee is indeed a condition of the loan, thus similarly rendering it interest as defined by statute. NCP insists that Ms. Spellman had the choice to pay the fee directly to SunUp as opposed to financing it through them, begging the obvious question: if Ms. Spellman had $3,263.38 at her disposal, why would she need a loan in the amount of $1,750? A choice that is wholly illusory is no choice at all. Dismissal at this stage leaves the record devoid of any examination into whether Ms. Spellman could have obtained her loan without incurring the CSO fee.

{¶24} NCP counters that Ms. Spellman ignores the plain language of the promissory note, which describes the fee as "not interest for purposes of Ohio law." Perhaps, but in contracts of adhesion involving consumer transactions in a regulated area, courts must pay closer attention to the substance of the contract. "This closer scrutiny is necessary for the preservation of the protections afforded consumers through legislation." *Eagle v. Fred Martin Motor Co.*, 157 Ohio App.3d 150, 2004-Ohio-829, 809 N.E.2d 1161, ¶ 45 (9th Dist.). And just because the loan documents proclaim that the CSO fee is only charged by and payable to SunUp does not make it so—that is a legal conclusion that the courts below should draw from a complete

record. The only thing we know for certain at this point is that Ms. Spellman has pled a plausible set of facts from which a more thorough discovery process may reveal that the CSO fee meets the statutory definition of interest.

{¶25} Finally, regarding potential violations of the MLA, Ms. Spellman offers one additional argument. If the CSO fee is not principal, and it is not interest, then she contends that it is verboten by Ohio law. In support of this argument, Ms. Spellman points to the part of the statute directing that "no further or other amount, whether in the form of broker fees, placement fees, or any other fees whatsoever, shall be charged or received by the registrant." Former R.C. 1321.57(H)(1). NCP maintained in its brief and at oral argument that the CSO fee is not principal or interest but is something else, "a fee that is independent of the loan issued by NCP." NCP goes on to insist that the CSO fee is not subject to the prohibitions in R.C. 1321.57(H)(1) because it only applies to registrants, and the fee is "only charged by and payable to SunUp," a nonregistrant. Again, this assertion requires us to construe facts in favor of NCP and SunUp. NCP's involvement with SunUp and the charging of the CSO fee is not yet fleshed out by the record. The question before us at this stage is whether, based on Ms. Spellman's third-party complaint, the CSO fee could be classified as unauthorized under the applicable version of R.C. 1321.57(H)(1). We believe it could, based on the pleadings at hand and the contracts in the record.

{¶26} NCP's only defense on this point features the now-familiar refrain that it played no role in the charging of CSO fee, professing that the MLA does not apply because "SunUp is the only party that charged or received fees relating to the CSO." NCP is correct that former R.C. 1321.57(H)(1) applied only to registrants. But NCP is a registrant, and the statute prohibits broker fees or any other fees whatsoever from

being charged *or received* by the registrant. SunUp appears to qualify as a broker, defined in the former R.C. 1321.51(J) as "a person who acts as an intermediary or agent in finding, arranging, or negotiating loans, other than residential mortgage loans, and charges or receives a fee for these services." Does Ms. Spellman's reimbursement of the broker fee to NCP equate to a broker fee being paid to a registrant? It is too soon to tell, but the parties structured these payments so that NCP received them from the borrowers. The statute includes the word "received," and while NCP can protest that it funneled the money back to SunUp, it has difficulty escaping the fact that it received these funds (or was supposed to) on the state of this record. Based on the alleged facts before us, if NCP is correct that the CSO fee is neither principal nor interest, then the contract plausibly could violate R.C. 1321.57(H)(1) if NCP received "a further or other amount" in the form of SunUp's fee as well as interest on the CSO fee.

{¶27} We appreciate that borrowers have taken a "kitchen sink" approach to challenging the CSO fee, but they can do that at this stage. Indeed, both parties have taken different, and sometimes inconsistent, positions on how the CSO fee should be characterized between their trial and appellate court briefings. That is likely attributable to the novel nature of the structure of these loans, and further factual probing will help illuminate the legal issues at play. Regardless of how the CSO fee is ultimately defined, Ms. Spellman's third-party complaint sets forth facts at this point from which it could be reasonably inferred that a violation of the MLA occurred. That is enough to allow these cases to proceed.

B.

{¶28} Ms. Spellman's breach-of-contract claim (Count II) similarly relies on an initial classification of the CSO fee. The claim alleges that NCP failed to refund any

16

amounts paid which exceeded the highest interest rate allowed by law. That determination cannot be made until the trial courts grapple with whether the CSO fee is interest or another type of unauthorized charge (or whether it rejects those claims and finds it perfectly permissible). There are simply too many unknowns that could tip the scales in Ms. Spellman's favor to conclude that she has pled no possible set of facts that would entitle her to relief.

C.

**{¶29}** In addition to violations of the MLA and the contractual claim, Ms. Spellman further suggests on appeal that the CSO fee is a type of insurance guaranty prohibited by the Ohio Insurance Producers Licensing Act. NCP and SunUp responded that the borrowers failed to raise this cause of action before the trial courts, including it only as part of their claim under the MLA. Our review of the complaint shows that Ms. Spellman included the credit-guaranty insurance as a type of unauthorized fee prohibited by the MLA, but in the context of Count I of her complaint alleging a violation of the MLA. NCP and SunUp's motion to dismiss contains a heading stating that the CSO fee is not a guaranty fee or credit-guaranty insurance, though they fail to develop the argument further.

**{¶30}** In other words, neither party focused on the insurance aspect of this claim below. At this stage of the proceedings, we have no cause of action alleging a violation of any insurance-related statutory regime to evaluate. We have already concluded, based on the analysis above, that Count I survives the motion to dismiss by virtue of the MLA alleged violation. In light of that, and given the absence of any real elaboration on this point below, we decline the invitation to wade into the insurance-related arguments that the parties present on appeal.

D.

**{¶31}** In addition to the preceding discussion, Ms. Spellman further alleged that SunUp engaged in fraudulent and deceptive consumer transactions (Counts III and IV). We have little hesitation drawing an inference of these violations in favor of Ms. Spellman, consistent with our analysis above and given the standard under Civ.R. 12(B)(6). SunUp may not be a registrant governed by the MLA, but it is a CSO subject to the provisions of the CSOA. The CSOA mandates that organizations that offer credit repair, debt counseling, or related services provide consumers with a clear and accurate description of the services to be provided and the costs for such services. SunUp claims it provided a service to Ms. Spellman and the other borrowers, namely "assisting in arranging an installment loan," "preparing and completing the information and documents," and "providing a guaranty to the lender to back the loan." When asked during oral argument what assistance SunUp provides to the customer in filling out what appears to be a standard online form, SunUp's counsel (correctly) declined to answer because that information fell outside the record considering that we are only at the motion to dismiss stage—precisely the point of why dismissal at this stage is improper. SunUp should be providing some substantial services to borrowers to charge them double the amount of their loans, but what those services are remains a mystery on the state of this record.

**{¶32}** On the face of Ms. Spellman's third-party complaint, which includes the CSA between her and SunUp, we find it plausible that SunUp provided little actual service to her. The agreement provides that Ms. Spellman is "request[ing] CSO to provide a guaranty to assure payment to Lender," but also that Ms. Spellman promises "to reimburse CSO for any amounts CSO pays the Lender pursuant to the guaranty."

Logically, this means that Ms. Spellman paid SunUp $3,263.38 (or NCP, or both, depending on what the trial courts find when they peek behind the veil covering this liaison) for nothing more than the word "guaranty" on a piece of paper. Because SunUp reserved the right to collect any fees incurred should it be forced to honor its "guaranty," it can (theoretically) collect twice on Ms. Spellman. Potentially three times when you count the money owed to NCP. (For instance, given Forsythe's complaint, it is apparently pursuing NCP's interests, but SunUp could separately pursue borrowers for any guaranty claim.)

{¶33} The CSOA also prohibits CSOs from engaging in unconscionable, unfair, or deceptive acts or practices as those terms are defined by the Ohio Sales Consumer Practice Act ("OCSPA") in R.C. Chapter 1345. The OCSPA describes seven circumstances in former R.C. 1345.03(B) that should be taken into consideration when determining whether an act or practice is unconscionable. Of relevance here is R.C. 1345.03(B)(4), which states that it is unconscionable for a supplier to make a transaction knowing that there was no reasonable probability of payment in full by the consumer. On the state of this record, we cannot answer whether SunUp inquired into Ms. Spellman's ability to repay the amounts borrowed. Other potential provisions could also be implicated. *See, e.g.,* R.C. 1345.03(B)(1) (whether a supplier took advantage of the consumer's inability to protect his or her own interest); R.C. 1345.03(B)(2) (whether a supplier knew the consumer transaction's price substantially exceeded similar transactions); R.C. 1345.03(B)(3) (whether a supplier knew the consumer was unlikely to receive a substantial benefit from the transaction); R.C. 1345.03(B)(5) (whether a supplier knew the terms of a consumer transaction were substantially one-sided).

**{¶34}** SunUp claims on appeal that any claim for a violation of the OCSPA is barred by the statute of limitations, but it has yet to broach this argument before the trial courts (failing to include it in any of the motions to dismiss), so we have no occasion to consider it at this point. *See State ex rel. Zollner v. Indus. Comm.*, 66 Ohio St.3d 276, 278, 611 N.E.2d 830 (1993) ("A party who fails to raise an argument in the court below waives his or her right to raise it here."). SunUp can certainly pursue the timeliness defense on remand if it believes the facts warrant it.

**{¶35}** As pleaded before us, however, this arrangement between SunUp and NCP seems incongruous with the purpose and intent of the CSOA, which is to protect consumers from credit repair service organizations that charge high fees but provide little service to consumers. Indeed, these types of concerns appear to have galvanized the General Assembly to pass H.B. 123, The Ohio Fairness in Lending Act, in 2018. In fact, none of the loans in this case would be allowed today, as H.B. 123 revised the CSOA to prohibit registered CSOs from assisting in the origination of short-term loans when the repayment term is less than a year, when the loan is less than $5,000, and when the annual percentage rate of the loan is greater than 28 percent. *See* R.C. 4712.071. We cannot turn a blind eye to the General Assembly's efforts to protect consumers from this exact scenario.

## IV.

**{¶36}** In conclusion, the arrangement described in the borrowers' third-party complaints looks very concerning, and they have pled facts which may prove violative of Ohio law. Of course, at this stage of the proceedings, we have only heard their side of the story—but that is how motions to dismiss work, and we accordingly express no view on the merits of the borrowers' claims. For the reasons set forth above, the trial

courts below erred in granting NCP and SunUp's motions to dismiss for failure to state a claim. We reverse the judgments of the trial courts, sustain the borrowers' assignment of error, and remand the cause to the trial courts for proceedings consistent with this opinion.

Judgments reversed and cause remanded.

**BOCK, J.,** concurs.

**ZAYAS, P.J.,** concurs in judgment only.

Please note:

The court has recorded its own entry this date.